**WAITE v. SECOND NAT. BANK OF BELVIDERE, ILL.**

No. 9386.

Circuit Court of Appeals, Seventh Circuit.

July 1, 1948.

---

SPARKS, Circuit Judge.

Appellee, as trustee in bankruptcy, sued to recover certain alleged preferential payments made by the bankrupt to his bank within four months prior to the filing of the voluntary bankruptcy proceeding. The court found the payments to constitute preferences, as alleged, and ordered payment of the sums of $12,113 and $344, with interest from dates of payment by the bankrupt. Appellant asserts error as to the entire judgment, contending that the payments were not preferential, but if the judgment be found correct as to the principal amounts, then it asserts error in the allowance of interest from date of original receipt by the bank instead of from date of suit or judgment.

The bankrupt, McMackin, had for several years operated as a cattle dealer, buying stock in surrounding states for shipment to and sale through the Belvidere Livestock Company, to which we shall refer as the Company, which held its sales each Friday. Sidney Gorman, executive vice-president of appellant bank, had acted as clerk of these sales for some time, and was thoroughly familiar with the bankrupt's mode of doing business. The latter had had an account in the bank for many years, and for a period of about a year prior to his voluntary proceeding in bankruptcy, the bank had permitted him to follow an arrangement by which he left blank, signed, unsecured notes payable to the bank and used checks on the bank to pay for cattle which he went into surrounding states to buy. As the checks came in, they were paid, and at the close of each day, his notes were filled in for an amount corresponding to the total of the checks paid out during the day. Each Friday, after the weekly sale, Gorman as clerk figured up the amount due each dealer and issued the check of the Company to each. Each Saturday, McMackin came into the bank and deposited his check, paid up his notes for the previous week, and made out a new series in blank, to be used the following week.

Friday, September 17, 1943, the situation was that McMackin had $92.87 in his open account, and owed the bank $13,955 on his

Carlton K. Welsh, of Rockford, Ill., and Harold C. Sewell, of Belvidere, Ill., for appellant.

Floyd E. Eckert, Sr., of Woodstock, Ill. (Robert W. Besse, of Sterling, Ill., and Alexander J. Strom, of Belvidere, Ill., of counsel), for appellee.

Before SPARKS and KERNER, Circuit Judges, and LINDLEY, District Judge.

notes, $13,000 of which was for what we may call "current indebtedness," represented by three notes dated September 11, 14, and 16, incurred on his transactions of the current week, and $955 on two unsecured notes not yet matured (six month notes maturing respectively November 8 and December 19, 1943). The sale on that day, September 17, did not dispose of all of McMackin's stock, and he was forced to carry over twenty-eight head of cattle until the following week, and his check was for only about $9300, insufficient to cover all his notes to the bank. On that day, the bank refused payment on two checks sent in for collection aggregating $4,414 for the purchase of two lots of cattle, and notified the forwarding banks of their protest. Subsequently, however, the protest was withdrawn, and the checks were called back from the notary and paid, one following a telephone call on September 20, when Gorman stated to the president of the forwarding bank that proper arrangements had been made, and appellant would pay further checks of McMackin given for cattle purchases.

On September 18, when McMackin came in for his regular weekly, Saturday reckoning, the president of the bank and Gorman both talked to him about his financial affairs and obtained from him the first financial statement they had had since 1941 or 1942, although this was admittedly incomplete, showing only his assets as valued by himself. Gorman testified that they did not ask him whether he owed anyone besides the bank, or whether there were then any checks outstanding. This so-called financial statement, introduced as an exhibit by appellant, shows assets valued at $10,678, consisting principally of cattle at the barn (the 28 head not sold September 17), or in transit (the two lots involved in the protested check transaction), and a few other items explained elsewhere as due from the sale of cattle to private parties, and nine cows owned by the bankrupt on two farms. In addition, Gorman testified that he "always figured he (McMackin) had four or five thousand dollars worth of property on the farm," although he did not state any basis for this belief and there is nothing in this record to substantiate a contention that he had anything apart from assets listed in the exhibit.

As a result of the conference, the two bank officers determined to permit Mc Mackin to continue doing business in the same way and agreed to pay the two checks held for protest the day before. McMackin signed a new note for $8200 to cover these checks and the balance of indebtedness on the earlier transactions of the week. The following week McMackin again went out and bought cattle for the sale on Friday, September 24, at which he had 97 head for sale, including the 57 listed in the September 18 statement. During that week additional notes aggregating $3900 were filled in by the bank as checks came in, including a $3000 one on September 20, $500 on September 21, $300 on September 22, and $100 on September 24. Payment on five checks dated September 23 and 24, given for further cattle purchases aggregating $8181, was refused. The record does not disclose whether or not these cattle were included in the September 24 sale.

The total proceeds of the September 24 sale amounted to $12,726, a check for which was deposited in the bank on September 25. On the same day, in accordance with his usual practice, McMackin gave the bank a check for $12,113 to cover his notes with interest, and signed new notes in blank. About noon of that day, he called Gorman and told him he was issuing a check for $300 to pay for an automobile and told him not to put through any more notes. Later in the same day he called again, saying he was leaving the country, and, in reply to Gorman's question whether he had any checks outstanding, he stated that he supposed he had, but those would just have to go back. Subsequently, on September 27, the bank closed McMackin's account, applying the balance then on hand of $344 against the two unmatured unsecured notes due November 8 and December 19 aggregating $955. Gorman testified that the reason for charging this account off and applying the money on the unmatured notes was "because we figured we would get it before somebody else would," admitting that on Monday, September 27, they knew there were other checks and obligations outstanding in favor of other parties.

McMackin was adjudicated a bankrupt on October 29, 1943, on his voluntary petition, and appellee was appointed trustee of his estate.

The court found that at the time of the two transfers McMackin was insolvent, and the bank not only knew of such insolvency, but had every reason to know it since all his transactions concerning the sale of cattle and the application of funds were entirely handled by or were within the knowledge of Gorman. He therefore rendered judgment in favor of the trustee for the amounts of both transfers, with interest from the date of each.

Appellant does not deny the insolvency of the bankrupt, and states that there are no material disputes in the evidence. It contends, however, that the only issue is whether or not appellee has proved that it had reasonable cause to believe that the bankrupt was insolvent on Saturday morning, September 25, when it accepted payment of his notes in the amount of $12,113.

We think there can be no serious dispute as to appellant's knowledge of the bankrupt's insolvency in view of the close relationship between Gorman, executive vice-president and cashier of the bank and also clerk for the Company sales, and the bankrupt. In fact, Gorman was in as good a position as the bankrupt himself to know of his exact financial condition at all times, as an executive officer of the bank, handling transactions of the bankrupt with that bank, and also his transactions with the Company.

In the case, Studley v. Boylston Nat. Bank, 229 U.S. 523, 33 S.Ct. 806, 807, 57 L.Ed. 1313, the Court considered facts somewhat similar to those of the case at bar, but held that because the bank had no reasonable cause to believe that transfers of funds to itself would effect a preference, the trustee in bankruptcy could not recover alleged preferential transfers, stating:

"But if, *as found by the Referee,* the Bank had no reasonable cause to believe such transfer would effect a preference, the payments by checks for $15,000, drawn on the deposit account, are as much protected as if on the same dates similar checks had been given in payment of like amounts due another bank with which * * * kept no account. For there is nothing in the statute which deprives a bank, with whom an insolvent is doing business, of the rights of any other creditor taking money without reasonable cause to believe that a preference will result from the payment. The Bankruptcy Act contemplates that by remaining in business and at work an insolvent may become able to pay off his debts. It does not prevent him from continuing in trade, depositing money in bank, drawing checks and paying debts as they mature, either to his own bank or any other creditor. It does provide, however, that if bankruptcy ensues all payments thus made, within the four months period, may be recovered by the Trustee, *if the creditor had reasonable cause to believe that a preference would be thereby effected.*" (Our emphasis.)

We think the ruling of the Court in this case is an excellent guide for us in our consideration of the case at bar. Here, contrary to the situation of the Studley case, the court found, and its finding is sustained by ample evidence, that the bank not only knew, but had every reason to know of the bankrupt's insolvency on the dates when the transfers were made, the first by check of the bankrupt, and the second, by application of the balance on open account to unmatured notes of the bankrupt. This appears to us to be a clear-cut case for imputing the knowledge of facts peculiarly within the knowledge of its executive officer to the bank itself. Cf. Pittman v. Union Planters Nat. Bank, 6 Cir., 118 F.2d 211.

Appellant does not rely on section 60, sub. c of the Bankruptcy Act, 11 U.S.C.A. § 96, sub. c, permitting set-off in certain cases, hence we have no occasion to consider the possible applicability of that section. We find no error in the action of the District Court in ordering the repayment of the preferential transfers.

With respect to the interest allowed from the dates of the respective transfers, we think the court was in error. While there appears to be some difference of opinion as to this (see Remington on Bank-

rupty, 4th Ed., Vol. 5, sec. 2310), the weight of authority appears to support the rule that interest may be allowed from the date of demand, or, if there be no such demand, then from the date of commencement of the action. See Kaufman v. Tredway, 195 U.S. 271, 25 S.Ct. 33, 49 L.Ed. 190; Larkin v. Welch, 7 Cir., 86 F.2d 442; White Co. v. Wells, 6 Cir., 42 F.2d 460; Elliotte v. American Sav. Bank & Trust Co., 6 Cir., 18 F.2d 460. We do not find the Illinois statute, Chap. 74, sec. 2, relating to Interest, relied upon by appellee, authority for a contrary ruling.

The judgment is modified as to the amount of interest, and as modified, affirmed.