Philip I. PALMER, Jr., etc., Plaintiff-
Appellee,

v.

RADIO CORPORATION OF AMERICA,
Defendant-Appellant.

No. 71–1312.

United States Court of Appeals,
Fifth Circuit.

Dec. 30, 1971.

Marvin S. Sloman, Earl F. Hale, Jr., Dallas, Tex., Carrington, Coleman, Sloman, Johnson & Blumenthal, Dallas, Tex., for defendant-appellant.

A. L. Vickers, Vernon O. Teofan, Ungerman, Hill, Ungerman & Angrist, Dallas, Tex., for plaintiff-appellee.

Before GEWIN, GOLDBERG and DYER, Circuit Judges.

GEWIN, Circuit Judge:

Appellee Philip I. Palmer, as trustee (the trustee) in bankruptcy of Maxwell Electronics Corporation (Maxwell), brought this plenary action under § 60b of the National Bankruptcy Act, 11 U.S.C. § 96(b) against appellant RCA

Corporation (RCA) to recover an alleged preferential transfer. The district court granted the requested relief including interest from the time the action was commenced. We affirm the result reached, but for reasons different from those assigned by the district court.

This case was tried without a jury largely on stipulated facts. In October of 1969, Evans Broadcasting Corporation (Evans) made an offer in writing to Maxwell to purchase all of the assets of Maxwell's television broadcasting facility, KMEC–TV, in consideration of $40,-000 in cash and the assumption of certain specified liabilities and obligations of Maxwell. The Directors and shareholders of Maxwell voted to accept the offer and a formal written agreement was entered into on November 4, 1968. Consummation of the contract was made "subject to and conditioned upon" the Federal Communications Commission's (FCC) approval of the transaction. FCC approval came on April 2, 1969. On May 13, 1969 the transaction was closed and Evans took possession of the Maxwell assets. On May 16, 1969, an involuntary petition in bankruptcy was filed against Maxwell and it was adjudicated a bankrupt on June 3, 1969.

Included in the Maxwell obligations assumed by Evans were 17 promissory notes held by RCA. Until May 12, 1969, the day before the transaction was closed, RCA had no involvement in the preceding events. On May 12, Evans approached Maxwell and requested that the assumption by Evans of the RCA

liability be eliminated from the contract but Maxwell refused. Shortly thereafter, Evans and RCA agreed that certain of the notes which were past due according to their terms would be paid up-to-date,[1] in consideration of which RCA would accept a reduction in the principal amount of $5,000. The total indebtedness was thus reduced to $14,759.22. Pursuant to that agreement the last payment was made in January of 1970. It is the transfer from Maxwell through Evans to RCA which was found by the district court to be preferential in violation of § 60(a) of the Bankruptcy Act, 11 U.S.C. 96(a) (1).

■ Before a transfer may be deemed preferential under § 60(a) six statutory elements must be present:[2] (1) there must be a transfer of the debtor's property, (2) to or for the benefit of a creditor, (3) for or on account of an antecedent debt; (4) the transfer must be made or suffered while the debtor is insolvent, (5) within four months of bankruptcy; and (6) the effect of the transfer must be to allow the creditor to obtain a greater percentage of his debt than some other creditor of the same class. Section 60(b) adds the additional requirement that the transferee must have had reasonable cause to believe the debtor was insolvent at the time the transfer was made. Even though not expressly provided by the statute, it is implicit from the language used that the transfer must result in a diminution of the bankrupt estate.[3]

1. The notes contained an acceleration clause, and if enforced, all of the notes would have been in default and payable.

2. Bankruptcy Act, § 60(a) (1), 11 U.S. C.A. § 96(a) (1) (1968):
   A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of

his debt than some other creditor of the same class.
   See Mayo v. Pioneer Bank & Trust Co., 270 F.2d 823, 834–835 (5th Cir. 1949); 3 Collier on Bankruptcy ¶ 60.02 at 755–61 (14th ed. 1968) [hereinafter cited as Collier].

3. There is no statutory requirement that there be a diminution of the bankrupt estate. However, such a requirement is implicit in the language of the statute: a transfer "for or on account of an antecedent debt", shall not permit one creditor "to obtain a greater percentage of his debt than some other creditor of the same class." See Nat'l Bank of New-

■ It is our conclusion that the district court was correct in finding that the requisite elements of a preference under § 60 are present. Despite RCA's protestations, the payment by Evans of the debt owed by Maxwell to RCA, even though indirect, constituted a transfer within the meaning of § 60(a).[4] The transfer was for the benefit of RCA and on account of an antecedent debt. It was stipulated that RCA was an unsecured creditor of Maxwell. We deem the transfer to have occurred on May 13, 1969, within four months of the bankruptcy, and that it resulted in a diminution of the bankrupt estate. It was stipulated that Maxwell was insolvent on May 13, 1969 and there is no dispute as to the fact that RCA had reasonable cause to know of such insolvency. The parties further stipulated and the district court found that there were 66 other unsecured creditors of Maxwell who filed claims against Maxwell's bankrupt estate, totaling the sum of $2,270,635.34. The amount of funds available for distribution to unsecured creditors is $1,675.69 and there are no other sources which will materially increase the fund. Thus, the effect of the transfer was to allow RCA to get a greater percentage of its debt than other creditors of its class.

■ RCA's major contentions are that there was no transfer by Maxwell to Evans for its benefit on May 13, 1969, that any transfer for RCA's benefit was perfected on November 4, 1968, and that there was no diminution or depletion of the bankrupt estate by any payment to RCA. We think it clear that there was a transfer for the benefit of RCA within the terms of the statute and that such transfer actually benefited RCA. Indirect transfers have long been held to be within the scope of § 60(a).[5] There is no requirement, as RCA contends that payment must come out of specific assets or funds transfered by the bankrupt to the middle party (Evans).[6] It is sufficient that RCA received from Evans payment of a debt owed it by Maxwell which Maxwell had specifically bargained with Evans to pay.

■ Although the transfer was indirect, it nevertheless resulted in a diminution of Maxwell's estate. When Maxwell agreed to transfer its assets to Evans in exchange for cash and Evans' assumption of the RCA liabilities, the effect was that Maxwell agreed to accept less than the fair value of the assets in exchange for Evans' assumption of Maxwell's liabilities. This exchange and the ultimate payment to RCA resulted in a diminution or depletion of the bankrupt estate which favored RCA over other creditors.

We agree with the district court's finding that the transfer occurred within four months of bankruptcy. However, the lower court based its judgment on the erroneous conclusion that the Maxwell-Evans contract created an equitable

---

port v. Nat'l Herkimer County Bank, 225 U.S. 178, 184, 32 S.Ct. 633, 56 L.Ed. 1042, 1046 (1922); Virginia Nat'l Bank v. Woodson, 329 F.2d 836, 839 (4th Cir. 1964); Citizens' Nat'l Bank of Gastonia, N.C. v. Lineberger, 45 F.2d 522, 526 (4th Cir. 1930); Walker v. Wilkinson, 296 F. 850 (5th Cir.), cert. denied, 265 U.S. 596, 44 S.Ct. 639, 68 L.Ed. 1198 (1924). But see J. McLachlan, Law of Bankruptcy § 251 (1956).

4. 11 U.S.C.A. § 1(30) (1966) (Emphasis added):
   "Transfer" shall include the sale and every other and different mode, *direct or indirect*, of disposing of or of parting with property . . . .

It is well established that a transfer by indirection may result in a voidable preference. National Bank of Newport v. National Herkimer County Bank, 225 U.S. 178, 184, 32 S.Ct. 633, 56 L.Ed. 1042, 1046 (1913) Aulick v. Largent, 295 F.2d 41, 50–51 (4th Cir. 1961); Greenblatt v. Utley, 240 F.2d 243, 245 (9th Cir. 1956) (dictum); Inter-State Nat'l Bank of Kansas City v. Luther, 221 F.2d 382, 393 (10th Cir. 1955), cert. dismissed, 350 U.S. 994, 76 S.Ct. 297, 100 L.Ed. 823 (1956); 3 Collier ¶ 60.08, at 793.

5. See note 4 *supra*.

6. *See* Virginia Nat'l Bank v. Woodson, 329 F.2d 836 (4th Cir. 1964).

lien and that the agreement was a conditional sales contract. Upon that basis the court reasoned that under Texas law a conditional sales contract is in effect a chattel mortgage which may be recorded under Tex.Civ.Stat.Ann. Art. 5490 (1968).[7] Thus, continued the court, since § 60(a) (6) of the Bankruptcy Act is applicable with respect to an equitable lien, the transaction must be perfected as against bona fide purchasers. Since in Texas a bona fide purchaser is preferred over a prior unrecorded chattel mortgage and here the contract was not recorded, the court concluded that under § 60(a) (2) the time of transfer was deemed to have been made immediately before the filing of the involuntary bankruptcy petition.

■ The court's reasoning would be correct if an equitable lien had been created and if the agreement was a conditional sales contract within the commonly accepted meaning of that phrase. However we think it a distortion of Texas law to hold that the November 4 agreement created an equitable lien. The authorities cited by the district court simply do not support such a characterization.[8] Nor do we think it a reasonable interpretation of Texas law to term the Maxwell-Evans agreement a conditional sales contract. Merely because consummation was contingent upon FCC approval does not make the contract a conditional sales contract within the accepted meaning of that phrase. Such contracts usually arise when the

buyer is given possession of the thing purchased and the seller retains the title until the conditions of purchase are fulfilled.[9] The agreement here was conditional but in the sense that FCC approval was a condition precedent to final consummation of the contract.

■ Our differences with the district court lie not with its answers to the questions presented but with its analysis. Because we are confronted here with an indirect transfer we focus first upon the Maxwell-Evans agreement and appropriate provisions of the Bankruptcy Act.

The Bankruptcy Act provides:

[A] transfer of property other than real property shall be deemed to have been made or suffered at the time when it became so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee. A transfer of real property shall be deemed to have been made or suffered when it became so far perfected that no subsequent bona fide purchase from the debtor could create rights in such property superior to the rights of the transferee.[10]

The Act goes on to provide that if a transfer is not perfected as required by the quoted statute prior to the filing of a petition in bankruptcy then it shall be deemed to have been made "immediately

---

7. Article 5490 applies to chattel mortgages, deeds of trust, or other instruments "intended to operate as a mortgage, or lien upon personal property." Whether the district court considered the agreement under scrutiny as a chattel mortgage or lien upon personal property is not clear. We think the court erred in classifying it as either.

8. The district court noted that an equitable lien may be created by an express executory agreement to convey in Texas, citing Bradley v. Straus-Frank Co., 414 S.W.2d 504 (Tex.Civ.App.1967) and 36 Tex.Jur.2d Liens § 16 (1962). These authorities do support the proposition that an equitable lien *may be* created by an

express executory agreement to convey, but go further and add that in order to do so the agreement must sufficiently indicate an intention "to make some particular property a security for a debt or obligation," and that "there must be an intention to create the lien which is clearly apparent from the language of the instrument itself together with the attendant circumstances." 414 S.W.2d at 508. These latter prerequisites are not present in the instant case.

9. 5 S. Williston, Contracts § 734 (3 ed. 1961); 58 Tex.Jur.2d Vendor and Purchaser § 5 (1964).

10. Bankruptcy Act § 60a, 11 U.S.C.A. § 96(a) (2); *see* 3 Collier ¶ 60.36 at 913.

before the filing of the petition."[11] For the purpose of determining when a transfer is perfected state law is applied.[12]

The most difficult aspect of this case is that the agreement to transfer was made prior to the four month period while the actual transfer was completed just prior to bankruptcy. Had the agreement, FCC approval, and final consummation of the transaction all occurred within the four month period a preferential transfer would likely be considered obvious in the circumstances disclosed by the record. Research has not revealed a similar case in which a buyer agreed to assume a debtor-bankrupt's liability as part of the consideration for a sale of assets to be consummated in the future. However, the Ninth Circuit in Kent-Reese Enterprises v. Hempy,[13] held that even though a written agreement was entered into more than four months prior to bankruptcy, if the transfer was not perfected as of that time, a subsequent transfer pursuant to the prior agreement will be considered preferential.[14] In Kent-Reese, a three-way agreement was entered into by Douglas, Reese and Kent-Reese Enterprises, Inc. (Kent-Reese) and Big Boy Markets, Inc. (Big Boy), the bankrupt. Douglas and Reese were the principal owners of both Kent-Reese and Big Boy. Under the agreement Douglas and Reese agreed to let Big Boy retain $30,700 on a demand loan basis; Kent-Reese agreed to act as guarantor of the loan; and Big Boy agreed to let Kent-Reese apply any sums it had to pay as guarantor, to the balance owing on a $54,000 promissory note which had been executed by Kent-Reese with Big Boy as payee. Almost a year later Big Boy filed a petition in bankruptcy. Shortly thereafter, Douglas and Reese made demand on Kent-Reese for $30,700. Kent-Reese paid Douglas and Reese and considered its obligations to Big Boy satisfied under the prior agreement. The trustee claimd that the transfer was within the four month period and hence an unlawful preference. Kent-Reese argued that the prior agreement constituted a transfer of Big Boy's rights under the promissory note to Kent-Reese. The court held the transfer to be avoidable preference since there had been no perfection of the transfer under § 60(a) (2) of the Bankruptcy Act.

In comparing Kent-Reese with the instant case Evans stands in a similar position to Kent-Reese while RCA may be compared to Douglas and Reese. RCA attempts to distinguish the case on the ground that it dealt with the transfer of property from the bankrupt to the middleman, rather than "rights" under the agreement. That argument is spurious. Regardless of the nature of certain rights which might have come into existence under the November agreement they were of no consequence *unless* the transfer was perfected.

■ We know of no theory under which it can be said that the Maxwell-Evans agreement of November 4 gave to Evans rights superior to those of a judgment lien creditor or a bona fide

11. Id.

12. Corn Exchange Nat'l Bank & Trust Co., Philadelphia v. Klauder, 318 U.S. 434, 63 S.Ct. 679, 87 L.Ed. 884 (1943) ; In re Souder (O'Connor v. Tappan), 449 F.2d 284 (5th Cir. 1971) ; In re Ideal Mercantile Corp., 244 F.2d 828 (2d Cir. 1957) ; 3 Collier ¶ 60.39 [2] at 957.

13. 378 F.2d 910 (9th Cir. 1967).

14. The Bankruptcy Act and particularly the section dealing with time of transfer, has been amended several times since its enactment in 1898. The following cases pre-date the present statute but do not involve prior agreements to transfer which were outside the four month period. Wilson Brothers v. Nelson, 183 U.S. 191, 22 S.Ct. 74, 46 L.Ed. 147 (1901) ; Corney v. Saltzman, 22 F.2d 268, 269 (2d Cir. 1927) ; First Nat'l Bank of Coleman, Tex. v. Ragsdale, 294 F. 282 (5th Cir. 1923) ; Hayes v. Gibson, 279 F. 812, 814–815 (3d Cir.) cert. denied, 259 U.S. 581, 42 S.Ct. 464, 66 L.Ed. 1074 (1922) ; In re Great Western Mfg. Co., 8 Cir., 152 F. 123, 127 (1907). At present, prior agreements may be effective to preclude a subsequent transfer being deemed preferential only if the prior agreement was "perfected."

purchaser.[15] The November 4th agreement was a contract to see chattels, fixtures, and real estate, the assets of Maxwell, in the future upon the performance of a condition precedent—when the FCC approved the sale. The language of the agreement itself discloses this fact. "Article First" of the agreement reads:

On the closing date hereinafter provided for, seller *will sell*, assign, *transfer*, convey and deliver to buyer: (emphasis added)

"Article Second" continues:

In addition, Buyer *will assume* and discharge Seller's obligations under the following: (emphasis added)

Texas law provides for the recordation of a contract to sell realty.[16] However, where personalty is included in the same contract it is not affected by the recordation.[17] It appears that under Texas law there is no provision for the recordation of a contract to sell personalty which is not a chattel mortgage.[18] Thus, even though the agreement of November 4 may have been completed and irrevocable as between Maxwell and Evans,[19] the transfer was not perfected at that time within the terms of the Bankruptcy Act. The record before us reveals no recordation whatsoever. After FCC approval and on the closing date Maxwell executed a quit claim deed to Evans transferring title to its real property and a bill of sale transferring title to other assets. At that point Evans' interest in Maxwell's property was perfected. However, from November to May a lien creditor of Maxwell's or a bona fide purchaser of real property from Maxwell would have had rights superior to those of Evans. RCA claims rights superior to those of Evans under the November agreement.

■■ Under the November executory contract to sell, RCA stood as a third party creditor beneficiary. Texas jurisprudence provides that no rights accrue or liabilities attach under such a contract until the creditor beneficiary *accepts* the contract. Cedillo v. Standard Oil Company;[20] Rau v. Modern Sales and Service, Inc.[21] RCA relies heavily on an 1889 Texas case, Mack Stadler & Company v. Talley Brothers,[22] for the proposition that acceptance is not necessary. However, in *Mack Stadler* the creditor maintained an action on the agreement under which he was the third party beneficiary. Bringing suit on or demanding payment under the contract is sufficient acceptance. Formal acceptance is not required.[23] But here RCA did nothing; it was not even aware of the agreement until May. Clearly the transfer for the benefit of RCA was not perfected so as to protect RCA's rights to receive payment from Evans as against a judgment lien creditor or a bona fide purchaser. Consequently, under § 60(a) (2) of the Act the transfer

---

15. Section 60(a) (2) merely establishes a test by which to judge whether a transfer of real property has been perfected; the trustee is not in fact a bona fide purchaser of the bankrupt's real property. 3 Collier ¶ 60.40 at 970. In Brookhaven Bank & Trust Co. v. Gwin, 253 F.2d 17, 20 (5th Cir. 1958) this court stated that under the present Bankruptcy Act "the bona fide purchaser test is no longer applicable to the perfection of transfers either of real or of personal property." That language is generally considered to be too strong. The test is still applicable in the case of real property, but as noted previously it is only a test.

16. 48 Tex.Jur.2d Records & Registration Acts § 30, at 353 (1963).

17. *Id.* § 32, at 355.

18. *See* 12 Tex.Jur.2d Chattel Mortgages § 1 (1960).

19. 3 Collier ¶ 60.36, at 913. *See also* In re Ideal Mercantile Corp., 244 F.2d 828 (2d Cir. 1957) where the court held that since a prior agreement between the parties was not enforceable as between them it could not be considered to be perfected under the Bankruptcy Act.

20. 291 F.2d 246, 249 and cases cited n. 4 (5th Cir. 1961).

21. 414 S.W.2d 203, 206 (Tex.Civ.App. 1967).

22. 3 Willson Civ.Cas.Ct.App. 572 (Tex. Ct.App.1889).

23. 13 Tex.Jur.2d Contracts § 353, at 630.

is deemed to have occurred in May immediately before the filing of the petition, rather than November.

RCA is somewhat inconsistent in its efforts to describe what it received under the November 4 agreement. At one point it argues that it has no right in any property under the Maxwell-Evans contract but instead merely a "right to receive" from Evans a chose in action. At another point it contends that it has never asserted any rights against Evans under the Maxwell-Evans agreement and that what it received from Evans was under a separate agreement for a separate consideration, namely the agreement of RCA to take a total sum smaller than that owed to it by Maxwell in exchange for Evans bringing the past due notes up to date.

This "right to receive" argument must fall since RCA never accepted the third party beneficiary contract. The "separate agreement" argument ignores the reason that Evans paid RCA anything at all. Evans did not decide to pay Maxwell's debt to RCA; as an act of kindness, it had agreed to do so by contractual agreement.[24] Thus, the transfer by Evans to RCA was for or on account of an antecedent debt owed by the bankrupt which transfer occurred within four months (less than 30 days) of bankrupty.

RCA also claims that the district court erred in permitting the trustee to attack the Maxwell-Evans agreement. The "attack" apparently refers to the Trustee's comment that had Maxwell not transferred its RCA liability to Evans, Maxwell would have received additional cash for its assets. RCA views this as an improper "weighing of considerations." We cannot agree. It is entirely reason-able to assume that Maxwell was not giving its assets away, and that had it not relieved itself of a liability, it would have demanded additional consideration of some sort.

The final issue raised by RCA is that the district court erred in awarding interest to the trustee. The court awarded interest to commence upon the date the complaint was filed. It is well settled that interest upon a voidable preference recovered by a trustee in bankruptcy should be computed from the date of demand for its return or in the absence of a demand, from the date of the commencement of the suit for recovery.[25] RCA relies solely on Roth v. Fabrikant Brothers, Inc.[26] and Professor McCormick's Hornbook on Damages [27] for the proposition that interest is proper only where the amount involved is liquidated. Here, says RCA, no liquidated sum was awarded, but instead an amount based on the negotiations and agreement between RCA and Evans. This argument is without merit. We accept as a general rule of damages that interest is only to be awarded where a liquidated sum is involved. However, here the amount was sufficiently certain. The amount RCA received was in satisfaction of the debt owed RCA by Maxwell. The court was not called upon to exercise discretion or venture an opinion on the amount to be awarded. The sum was fixed by the RCA-Evans settlement. RCA could not be fairly expected to pay interest on a sum greater than that which it received, but interest upon the preference it actually received is certainly proper.

Proceedings in bankruptcy often generate harsh results; indeed the very nature and theory of bankruptcy

24. Had Evans gratuitously paid Maxwell's debt to RCA there would have been no preferential transfer. *See* Inter-State Nat'l Bank of Kansas City v. Luther, 221 F.2d 382, 393 (10th Cir. 1955), cert. dismissed, 350 U.S. 944, 76 S.Ct. 297, 100 L.Ed. 823 (1956).

25. Kaufman v. Tredway, 195 U.S. 271, 25 S.Ct. 33, 49 L.Ed. 190 (1904); Salter v. Guaranty Trust Co., 237 F.2d 446 (1st Cir. 1956); Waite v. Second Nat'l Bank, 168 F.2d 984 (7th Cir. 1948); Anno., 4 A.L.R.2d 327 (1949).

26. 175 F.2d 665, 669–670 (2d Cir. 1949).

27. C. McCormick, Damages § 54.

contemplates injury to some claimants. In many cases, as in this case, unsecured creditors receive only a small fraction of the debt claimed. However, the purpose of § 60 of the Bankruptcy Act is to ensure that in the event of bankruptcy one creditor does not receive a greater share than another of the same class. In reviewing the transactions involved in cases of this type we do not look to the subjective intent of the parties involved but to the substance of what occurred as seen through the guiding lens of the Bankruptcy Act. Parties are free to make binding agreements which will protect their rights against even a lien creditor or a bona fide purchaser, but to preclude the subsequent transfer under the agreement from being an unlawful preference, they must perfect the initial agreement. If there is no actual perfection of such an agreement then there can be no transfer until the agreement is consummated.

The judgment of the district court is affirmed.