**In re CCI CONSTRUCTION CO, INC., a corporation, a/k/a CCI/Ortenzio Co., Inc., Debtor–In–Possession.**

**CCI Construction Co. Inc. and The St. Paul Companies, Plaintiffs,**

v.

**Allfirst Bank, Defendant.**

**Bankruptcy No.: 1–00–bk–02239. Adversary No.: 1–01–ap–00011.**

United States Bankruptcy Court, M.D. Pennsylvania.

April 18, 2007.

Robert E. Chernicoff, Cunningham and Chernicoff PC, Harrisburg, PA, for Debtor–In–Possession.

## OPINION [1]

JOHN J. THOMAS, Bankruptcy Judge.

The Debtor–in–Possession, CCI Construction Co., Inc., and The St. Paul Companies,[2] (hereinafter "Plaintiffs") filed a Complaint to set aside several preferential payments by the Debtor to Allfirst Bank (hereinafter "Bank") under the terms of 11 U.S.C. § 547(b) or, in the alternative, for recovery of improper setoff pursuant to 11 U.S.C. § 553. While the parties stipulated[3] the several transfers in question were preferential under § 547(b), the Bank has responded that (1) the transfers are unavoidable because they all fall within the safe harbor provisions created by Congress found in 11 U.S.C. § 547(c)(2), and (2) did not effect a setoff under the dictates of 11 U.S.C. § 553. Based upon the following findings of fact and conclusions of law, the Court concludes the Bank has not met its burden of proving the nonavoidability of the transfers under 11 U.S.C. § 547(c). 11 U.S.C. § 547(g), *J.P. Fyfe,*

---

1. Drafted with the assistance of Richard P. Rogers, Law Clerk.

2. The St. Paul Companies were permitted to intervene in the above-captioned adversary by Order dated April 17, 2002. The St. Paul Companies hold themselves out as the largest, unsecured creditor in this bankruptcy, and therefore, they claim to have a significant interest in the disposition of this adversary proceeding.

3. Admittedly, the path taken by the parties entering into the stipulation was not an easy one as reflected by the colloquy of all parties involved during the first day of testimony (see Transcript of 2/3/2005 at 11–21). But, nonetheless, that stipulation guided the parties' presentation throughout the remainder of the trial and was acknowledged by the Bank in its post trial brief at page 1 wherein it indicates that the three payments were preferential transfers under the terms of 11 U.S.C. § 547. See Bank's Brief at 3 (Doc. # 80).

*Inc. of Florida v. Bradco Supply Corp.,* 891 F.2d 66, 69 (3d Cir.1989).

This adversary has survived both a Motion to Dismiss and a Motion for Summary Judgment.[4] The parties presented their respective cases during a trial which took the better part of two days. The Court notes that both sides did an excellent job in presenting this case.

The relevant facts are as follows. The Debtor is a general contracting business started approximately in the late 1980s. The Debtor started a borrowing relationship with the Bank's predecessor in the early 1990s. In addition to a certain equipment loan, this banking relationship was evidenced by a succession of unsecured lines of credit. (See Defendant's Exhibit 4A through F.) The line of credit was periodically reaffirmed and, on March 23, 1999, was increased to four million dollars. (See Defendant's Exhibit 11.) This line of credit was coupled with a March 24, 1999 film/cash solutions[5] promissory note (hereinafter "note") which contained the loan terms for the four million dollar line of credit advanced by the Bank to the Debtor. The note contained procedures for the making of loans, the termination of the note, the demand obligations for making immediate payment to the Bank of all sums outstanding under the note including principal and interest, and remedies available to the Bank upon default. Of significance to a resolution of this matter are the specific terms of the note, and, in particular, those concerning the procedures for advancing loans. Paragraph 2 of the note provides in its entirety as follows:

2. PROCEDURES FOR LOANS. All Loans shall be made in the form of a transfer of funds into the Account in accordance with the procedures set forth in this paragraph. Borrower hereby irrevocably authorizes Bank to make Loans in accordance with the procedures set forth herein. At the end of each Business Day, Bank shall calculate the Initial Excess Balance and the aggregate amount of the Presented Items. In the event the Initial Excess Balance is less than the aggregate amount of the Presented Items, Bank shall make a Loan by transferring funds into the Account in an amount equal to the amount, which when added to the Initial Excess Balance, would be equal to the aggregate amount of the Presented Items; provided, however, that: (a) the principal amount of the Loan shall not be less than the Minimum Loan Advance; (b) the principal amount of the Loan must be an integral multiple of the Incremental Advance Amount, and therefore, if it would not otherwise be an integral multiple of the Incremental Advance Amount, the amount of the Loan will be rounded up to the next higher integral multiple of the Incremental Advance Amount unless there is insufficient Line Availability in which case the Loan amount will be the Maximum Advance Amount; and (c) the principal amount of the Loan shall not exceed the Maximum Advance Amount. If at any time the amount of the Initial Excess Balance is less than the amount of the Presented Items by an amount greater than the Maximum Advance Amount, Bank shall: (i) make a Loan by transferring funds into the Account in an amount equal to

---

4. The Motion to Dismiss was denied by Order of Court filed December 14, 2001 (Doc. # 16). The Motion for Summary Judgment was denied by Order of Court filed May 20, 2004 (Doc. # 58).

5. This odd designation is repeated on the record, but never explained.

the Maximum Advance Amount; and (ii) determine, in its sole discretion, which Presented Items will be paid, and which Presented Items will not be paid. **In the event the Initial Excess Balance is greater than the amount of the Presented Items, Bank shall post and pay all of the Presented Items.** If, following Bank's posting and paying of all of the Presented Items, there remains a balance in the Account in excess of the Target Balance, Bank is hereby irrevocably authorized to debit the Account in an amount up to the portion of the balance in the Account which exceeds the Target Balance, and apply such sums to the outstanding balance of the Loans. Bank agrees to make such debit of the Account to repay sums outstanding under the Loans as of the end of each Business Day; provided, however, that in the event the option labeled "Cash Solutions Protection" is marked on Exhibit A attached hereto, Bank shall not automatically debit the Account to make payments on the Loans, but may do so, in its sole and absolute discretion.(emphasis ours)

This paragraph dictated the business relationship between the Bank and the Debtor in the day-to-day operation of the Debtor's business. Essentially, the Debtor's customers [6] would periodically wire payments into Debtor's account (No. 00288–6451–4) at the Bank. In the ordinary course, the Bank would then pay any presented checks either from a positive balance in the account or, if there were insufficient funds, an automatic advance under the note. At the end of each day, the account was "swept" automatically by the Bank's computer system. The funds "swept" would be applied to the Debtor's outstanding balance due on the note. This

relationship continued from the early 1990s until February of 2000.

On February 18, 2000, in a meeting between John Ortenzio, his lawyer, and certain representatives of the Bank, Mr. Ortenzio informed the Bank that CCI was experiencing short-term cash flow difficulties. The February 18, 2000 meeting was on a Friday which preceded a Bank holiday the following Monday. On February 22, 2000, $634,066.54 was deposited into the account and the Bank honored all checks presented by the Debtor's customers on that day. At the end of the day, the Bank "swept" the account in the amount of $510,840.84. On February 23, 2000, oral notice was given by the Bank to the Debtor that the Bank was not going to advance any further funds to the Debtor and that the Bank was going to deactivate the automatic sweep procedures established under the note. On February 24, 2000, formal written notice was given by the Bank to the Debtor of the following: the Bank discontinued the loans under the note, demanded payment of all outstanding obligations due the Bank from the Debtor, declared a default under both the equipment loan and the note, accelerated demand for immediate payment of all sums due thereunder, indicated that no further sums would be advanced under the note, and intended to dishonor any checks or other payments items in transit. (See Plaintiff's Exhibit 3.) On February 24, 2000, $638,911.65 was deposited into Debtor's account by its customers. Because the automatic computerized sweep portion had been disabled, the Bank manually entered a debit memo and removed the entire amount of the deposit from the account. Forty-six checks totaling $273,029.23 were posted to the account but were returned by the Bank for non-suffi-

---

**6.** Mr. John Ortenzio, president and sole shareholder of CCI, used the generic term "customers" to refer to the Debtor's receivables.

cient funds. On February 25, 2000, $1,167,539.00 was deposited into the account. Once again, the Bank manually entered a debit memo and removed the entire deposit from the account that day. Twenty-one checks totaling $162,562.40 were posted to the account from Debtor's customers, all of which were returned for non-sufficient funds.

The prayer of the Complaint requests the Court find that the three transfers from the account on February 22, 24, and 25, 2000 totaling $2,265,618.66, be declared as preferential transfers or, alternately, as an amount setoff by the Bank. The Complaint asks that the Debtor be awarded pre-judgment and post-judgment interests, costs, and fees in the action.

Having stipulated that the disputed payments were preferential transfers under § 547(b), the burden shifted to the Bank to prove the payments fell within the safe harbor provisions under § 547(c)(2), which Section reads as follows:

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

The Court finds, based upon the oral and written evidence submitted at the time of the trial, that the transfers in question fall within the parameters of § 547(c)(2)(A) in that they were made toward satisfaction of a debt incurred by the Debtor in the ordinary course of business or financial affairs of the Debtor and the Bank. The controversy centers around whether the payments in question, and the method upon which the Bank applied those payments on the outstanding amount due and owing under the note, met the requirements of § 547(c)(2)(B) and (C). In other words, it is both the second and third elements found in § 547(c)(2)(B) and (C) that are at issue.

The Third Circuit, in the case of *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corporation*, 891 F.2d 66 (3rd Cir.1989), addressed whether a disputed payment qualifies as made in the ordinary course of business under 11 U.S.C. § 547(c)(2)(B).

■ When addressing what was "ordinary course of business" under § 547(c)(2)(B), the Court wrote that the lower court had to analyze only the context of the business relationship between those parties involved in that case.

■ The *Fyfe* Court indicates that a "variation from the parties' normal course of doing business is significant." *Id.* at 70. This Court will follow the direction of the Third Circuit in the *Fyfe* case and will analyze the history and course of the business relationship of the parties in considering the arguments made as to whether those payments fall within the safe harbor of § 547(c)(2)(B). Specific attention will be directed to the payment history.

■ Concerning the requirements of § 547(c)(2)(C), we have guidance in the case *In re Molded Acoustical Products, Inc., (Fiber Lite Corporation v. Molded Acoustical Products, Inc.)*, 18 F.3d 217 (3d Cir.1994). In discussing § 547(c), the Third Circuit essentially adopts the approach outlined in the case of *Matter of Tolona Pizza Products Corp.*, 3 F.3d 1029 (7th Cir.1993). The Court writes

The Seventh Circuit, conscious of this difficulty, eschewed a bright line approach, concluding that:

"ordinary business terms" refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C.

3 F.3d at 1033 (emphasis in original), *quoted in Jones v. United Sav. & Loan Ass'n (In re U.S.A. Inns of Eureka Springs, Ark.),* 9 F.3d 680, 685 (8th Cir. 1993). Preferring to stay true to what scarce legislative history there is, we substitute the word "unusual" for "idiosyncratic" but otherwise adopt *Tolona Pizza's* definition.

*In re Molded Acoustical Products, Inc.,* 18 F.3d at 224.

█ Armed with this guidance, the Court can now analyze the facts as recited above to determine whether the transfers in question fall within the safe harbor provisions of § 547(c). The parties spent considerable time and effort attempting to convince the Court that the facts prove either that the transfers were made within the ordinary course of business between the parties and in the industry or that the transfers fell without. For their part, the Plaintiffs went to exhausting effort to show that the mere use of a debit memo, instead of the automatic computerized sweep element of the note, was a significant showing that the transfers were made outside of the ordinary course of business between the parties. Most of Plaintiffs' case centered around establishing the long-term business relationship between the parties and how that relationship manifested itself in the procedures for advancing loans under the note to the Debtor and the payment of Debtor's business obligations over the years. On its own behalf, the Bank, called employees and an expert, Mr.

Dorsch, to testify the revolving line of credit and the cash management facility were administered according to "ordinary business terms." The Bank's expert testified that any bank would have taken the actions taken by the Bank under the circumstances presented by the facts. The expert, however, also gave damaging testimony in several respects which the Court will discuss at a later point in this Opinion. The St. Paul Companies' rebuttal expert, Mr. Moro, gave testimony in direct contravention to the testimony of Mr. Dorsch.

Throughout all of the legal arguments, the reading of the approximately 420 pages of testimony, the review of binders of exhibits entered into evidence, and the copious pre and post trial briefs, one comment made by the Debtor seemed to direct the Court's attention back to what it now determines is the essential fact leading to the ultimate resolution of this matter. On page 14 of the Debtor's post trial memorandum, it writes that "at the heart of conducting business in the ordinary course as between the parties and upon ordinary business terms is conducting the dealings consistent with the agreements between the parties."

At various times in its argument and in its post trial brief, the Bank indicated that it "terminated" the note. See, e.g., Bank's Post Trial Brief at 15. The Court revisited Debtor's Exhibit 3, which is the February 24, 2000 letter from the Bank, under signature of its attorney, and notes that nowhere within the four corners of the letter does the Bank indicate that it terminated the note. The Court does find, without hesitation, that the letter indicated that the Debtor was in default under both the equipment loan and the note and that no further sums would be advanced under the note nor would checks or other payment items in transit be honored by the lender.

Termination procedures are found in paragraph 3 of the note, which paragraph reads, as follows:

3. TERMINATION. The procedure for making Loans, and the obligation of Bank to provide Loans, as set forth in this Promissory Note, may be terminated by Borrower upon ten (10) days prior written notice to Bank and may be terminated by Bank upon thirty (30) days prior written notice to Borrower. Upon termination, no further Loans shall be made under this Promissory Note, but all other terms of this Promissory Note (including, but not limited to, the holder's right to demand payment at any time and for any reason) shall remain in full force and effect.

The Court finds that the Bank did not terminate the note pursuant to paragraph 3 of the note. Regardless, even if the Bank could be considered to have terminated the note, the Bank would have violated the terms of the note by not giving the borrower (Debtor) thirty (30) days prior written notice of the termination. In other words, not honoring "presented items" under ¶ 2 of the note, the Bank would have violated the terms of the note. The Bank did, however, declare a default and, in that respect, we turn to paragraph 12 which consists of the remedies available to the Bank upon default. Paragraph 12 reads, in its entirety, as follows.

12. REMEDIES. Upon a default, in addition to all other rights and remedies available to the holder of this Promissory Note under any document or agreement between Borrower and Bank or under applicable law, the holder of this Promissory Note, in the holder's sole discretion and without notice or demand, may raise the rate of Interest accruing on the unpaid principal balance outstanding under this Promissory Note by two (2) percentage points above the rate of interest otherwise applicable. The Bank shall have no further obligation to provide any Loans to Borrower following: (a) a demand by Bank for payment hereunder; or (b) a default under this Promissory Note. Borrower agrees that a default under this Promissory Note is a default by Borrower under all other liabilities and obligations of Borrower to the holder, and that the holder shall have the right to declare immediately due and payable all liabilities and obligations owed by Borrower to the holder of this Promissory Note.

A remedy provided the Bank upon default is that it has no further obligation to provide loans to the borrower (Debtor) following a default and a demand by the Bank. The Court has no hesitation in finding that the Bank exercised this remedy and included all rights available to it in the February 24, 2000 letter found at Debtor's Exhibit 3. Where the Bank fails to abide by its responsibilities under the note is by failing to honor the checks written to the account by the Debtor to pay various suppliers, etc., on the 24th and 25th of February 2000. Nowhere in the note does the event of default give the Bank the right to ignore the procedures for covering checks as referenced in paragraph 2 of the note and, in particular, paying presented items should the excess balance at the end of the day be greater than the amount of the presented items.[7]

Judge Rosenn in the *J.P. Fyfe* case, *infra.*, reminds us that

The scanty legislative history of this section reveals only that "[t]he purpose of

---

7. The only reason there was a lack of funds to cover Debtor's checks was the premature "sweep" of funds by the Defendant.

the exception is to leave undisturbed normal financing relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." S.Rep. No. 989, 95th Cong., 1st Sess. 88, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5874.

*J.P. Fyfe, Inc.,* 891 F.2d at 70.

By way of additional comment, nothing would prevent a court from finding in the ordinary course, payments that were habitually late under the terms of an agreement between the parties. See *Matter of Xonics Imaging, Inc.,* 837 F.2d 763 (7th Cir.1988). Indeed, in *In re Molded Acoustical Products, Inc.,* Judge Becker instructs that the longer the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm and still stay within the safe harbor. This Court agrees with the analysis of both the Seventh and Third Circuits in this regard. But nowhere in the case law, and more importantly, nowhere in the evidence presented to this Court during the trial, can the Court find support in the position that a non-repetitive breach of a contract, by one of the parties, can be considered "ordinary" under either the second or third elements of the safe harbor provisions of § 547(c). To the contrary, the evidence presented by all parties to this dispute indicates that the failure to pay the presented items from the account was an extraordinary breach of the payment arrangements agreed to by the parties. The mere use of debit memos as opposed to the automatic sweep, however, was not a significant variation in the ordinary business between the parties and could well be a "red herring.".

Mr. Schwartz, an expert qualified on behalf of the Bank, testified on the first day of trial that the checks presented on the account on February 24 and 25, 2000 should have been honored. (Transcript of 2/3/2005 at 150–151.) Mr. Dorsch, another expert qualified on behalf of the Bank, testified that his understanding was that the cash management facility remained operative after the termination of the note. (Recall that the Court has determined that the note was not terminated but that a default was declared under the terms of the note.) He did testify that standard banking practices dictated that the note did not provide authority to the Bank to dishonor checks presented to the account for payment if money was actually in the account. (Transcript of 2/4/2005 at 137–138.) Finally, the expert presented on rebuttal, J.F. Moro, testified that, in order to get repaid, it was essential that the Bank follow the loan documents and abide by them. He further testified that banks cannot arbitrarily change the procedures used to process checks unless the document allows for it. (Transcript of 2/4/2005 at 233–235.)

After the meeting on February 18, 2000, the Bank, in order to protect its own interest at the expense of other creditors of the Debtor, breached the terms of the note which was negotiated between the parties at arm's length. As a result, the Bank's position was greatly enhanced by being able to pay down the amount due on the note at the expense of all the creditors whose checks were presented and dishonored even though there were sufficient funds in the account to pay those checks.

The Court determines that the Bank effectuated a preferential transfer by using the funds deposited into the account to pay down the note to the detriment of other creditors whose checks were presented on the account and dishonored. The Court

finds the Bank has not carried its burden of proof as required by § 547(g) proving that the transfers on February 24 and 25, 2000 were made in the ordinary course of business or financial affairs of the Debtor and the Defendant under § 547(c)(2)(B) and (C).

■ As to the transfer of February 22, 2000, the Court finds that, in all regards, the Bank followed the procedures for making loans, sweeping the account, and paying presented checks according to the terms of the note. Therefore, the Court finds that the transfer of February 22, 2000 falls within the safe harbor provisions of § 547(c).

■■ The Court will now turn its attention to that portion of the argument that all three transfers in question effected a setoff under § 553, and therefore, the funds should be returned to the Debtor as an invalid setoff. Initially, I note that the Bank contractually waived their right of setoff.[8] Moreover, the Supreme Court in the case of *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995) instructs us of the tripartite test to establish a setoff. There must be (1) a decision to effectuate a setoff; (2) some action accomplishing the setoff; and (3) a recording of the setoff. *Strumpf* at 19, 116 S.Ct. 286. The Court will not address whether the transfers of February 24 and 25, 2000 effectuated a setoff because it has already determined that those transfers were preferential and not subject to the safe harbor provisions of § 547(c). A finding of setoff in that regard does not further this cause, and the impact would be the same upon both Debtor and the Bank. But, what of the transfer on February 22, 2000? The Court has reviewed the testimony and has deter-

mined that the evidence falls short of a finding that there was a decision to effect a setoff of the deposits made that day. Of primary significance to that finding is the fact that on February 22, 2000, the Bank honored checks and swept the account as it had in the past pursuant to the terms of the note. The evidence falls short of proving whether the Bank intended that the sweep would be a setoff.

At the conclusion of the Plaintiff's post trial brief, it sets forth several methods for calculation of damages against the Bank. Two suggestions concern separate methods of calculating damages arising from the transfers of February 22, 24, and 25, 2000. Additionally, a calculation of damages to the extent that checks were bounced not only for those days but for subsequent days was presented. The Court will accept the suggested calculation of damages as the amount of all the dishonored checks presented on February 24 and 25, 2000. Those checks total $435,591.63. This amount represents the total by which the Bank improved its unsecured position.

■ Finally, the Court will address the Debtor's request for both pre and post judgment interest. Prejudgment interest in preference litigation has been permitted but not mandated since 1904 by the case of *Kaufman v. Tredway*, 195 U.S. 271, 25 S.Ct. 33, 49 L.Ed. 190 (1904). See, also, *Smith v. Mark Twain Nat'l Bank*, 805 F.2d 278 (8th Cir.1986); *Palmer v. Radio Corp.*, 453 F.2d 1133 (5th Cir.1971); *Salter v. Guaranty Trust Co.*, 237 F.2d 446 (1st Cir.1956); *Waite v. The Second Nat'l Bank*, 168 F.2d 984 (7th Cir.1948); *Larkin v. Welch*, 86 F.2d 442 (7th Cir.1936); and *White Co. v. Wells*, 42 F.2d 460 (6th Cir.

8. See paragraph 9 of the note. While there was testimony that the striking out of paragraph 9 was not authorized by the Bank, the

note, nevertheless, with the strike outs controlled the business relationship between the parties.

1930). This Court sees no reason to deviate from granting prejudgment interest in a successful preference action. The record is devoid of when demand was initially made in this case, and therefore, the Court will grant prejudgment interest from the date of the filing of the adversary initiating this Complaint.

An Order will follow.

### ORDER

For those reasons indicated in the Opinion filed this date, **IT IS HEREBY**

**ORDERED** that judgment is entered in favor of the Plaintiff, CCI Construction Co., Inc., a corporation, a/k/a CCI/Ortenzio Co., Inc., and against the Defendant in the amount of $435,591.63, together with prejudgment interest from the date of the filing of the adversary proceeding.