## LESTER H. WATKINS AND ANOTHER v. GEORGE LORENZ AND OTHERS.

119 N. W. (2d) 482.

February 1, 1963—Nos. 38,612, 38,613.

*Molter & Runchey,* for appellants Lorenz.
*B. V. Pierard* and *C. J. Donnelly,* for appellant Hardy.
*English & Velta,* for respondents.

THOMAS GALLAGHER, JUSTICE.

Action for damages by Lester H. Watkins and Ruth Watkins, his wife, against George Lorenz; Helen Lorenz, his wife; and A. J. Hardy, for fraud arising out of plaintiffs' purchase of a jewelry business in Marshall from defendants George and Helen Lorenz on November 30, 1959. At the time of purchase, the business was located in a store leased under a written lease by George Lorenz from Hardy. It is plaintiffs' claim that defendants induced them to purchase the business by falsely and fraudulently representing that the sale would include an assignment of the written lease described and that said lease contained an option under which the lessee might renew it for an additional 5 years from its expiration on June 1, 1961.

The jury first returned a verdict for plaintiffs in the total amount of $7,900, apportioning $1,500 against Hardy and $6,400 against the Lorenzes. The following proceedings then took place:

"The Court: Now, apparently, there has been some misunderstanding of the instructions, and for that reason, the Court cannot accept your verdict as written.

"It is a matter of the individual obligation, in so far as the defendants Lorenz are concerned and the defendant Hardy is concerned. Under the law, it cannot be divided by the jury.

"* * * it will be necessary that I have you return to resubmit or arrive at your verdict in accordance with the instructions that I have now given you, that the matter of the obligation as a result of any liability of either of the defendants is a legal question and will be dealt with in accordance with the law by the Court and is not to be divided by the jury. Does that explain it?

\* \* \* \* \*

"A Juror: Do I understand it to be if we decide in favor of the plaintiff, if there is to be a settlement, we are supposed to just put down one figure and the Court divides it?

"The Court: Yes. It is not a question for the jury as to what the method of payment will be, from the legal obligations resulting from your determination. I could tell you what it would be, but it is not to influence you in your decision."

Following this procedure, the jury again retired. A few minutes later it returned a final verdict in the sum of $7,900 against all defendants. Subsequently, the trial court made its order denying separate motions by Hardy and the Lorenzes for judgments notwithstanding the verdict or a new trial. They separately appeal from such order.

On appeal it is defendants' contention that (1) the evidence was insufficient to sustain a verdict against any of them in that it conclusively demonstrated that plaintiffs did not rely upon any false statements or misrepresentations by any of them in entering into the purchase contract; (2) the trial court erred in receiving parol evidence which in substance permitted a variance in the terms of the written purchase contract; (3) the court erred in its instructions with respect to damages; and (4) the evidence failed to disclose any damages to plaintiffs upon which a verdict could be based.

The facts are as follows: In November 1959, George Lorenz and Helen Lorenz were the owners of certain fixtures and equipment in a jewelry business located in a building owned by A. J. Hardy in the city of Marshall. They had been engaged therein for a period of 24 years but had closed the store February 1, 1959. Several months later they listed it for sale with William E. Haynes, a real estate agent in Marshall. The lease covering the store involved expired June 1, 1961. It was the last of a series of 5-year leases from Hardy, none of which contained any option for renewal.

About the middle of November 1959, plaintiffs came to Marshall to inquire as to opening up a jewelry store there. They had with them about $500 in savings to be used for an initial payment thereon. Shortly after they arrived in Marshall they called upon Haynes, who advised them that the Lorenzes had a jewelry business which they had listed with him for sale and arranged a meeting between them and plaintiffs. It appears that following this meeting plaintiffs and the Lorenzes came to some verbal agreement under which plaintiffs were to purchase the business from the Lorenzes. Thereafter on November 30, 1959, the parties entered into a written agreement, which was drawn up in the office of Z. L. Begin, an attorney at Marshall. It included the following provisions:

"That the said vendors sell to the said vendees, the business known as the said George R. Lorenz Jewelry business, located at 233 West Main Street, Marshall, Minnesota, in the Hardy Building, for the sum of Seven Thousand ($7,000.00) dollars, to be paid for, as listed below, * * *.

"That the said sale and purchase includes the good will of the said business, an assignment of the lease that the said vendors have on the said premises, up to June 1st 1961, on which the rental is $118.00 a month, which vendees agree to assume and pay, said payments to the landlord not to be considered as payments on the $7,000.00 agreed price herein. That the sale herein is of the business and lease to the first floor and the basement of the Hardy Building and is to include all the fixtures, furniture, instruments and apparatus in the said jewelry store, except a personal bench and small tools belonging to the

vendors. That included are the floor and wall cases, pen and watch band case, one partition around the watch department; one wrapping counter; one safe, one writing desk in the diamond room, one cash register, one file, one fan, three chairs, one diamond table, one large engraving machine, one watchmaster, one awning, one air conditioning unit, three soldering heat equipment, one polishing motor and attachments, one ring stretcher, one gold stamp machine, one cry grinder, one demagnetizer, one cleaning machine, one waterproof testing machine, one repair bench, all the window displays, and one electric street sign as is, vacuum cleaner, brooms, shovels, and one burglary alarm system.

\* \* \* \* \*

"That the said purchase price to be paid by vendees and accepted by the vendors, is the sum of $7000.00, payable as follows: $500.00 in cash, receipt of which is hereby acknowledged by the vendors, and $6500.00, bearing five per cent (5%) interest on all unpaid balances, payable as follows: $250.00 on or before January 1st 1960, and $250.00 on February 1st 1960, and the sum of Fifty dollars per month, starting July 1st 1960."

On December 4, 1959, plaintiffs commenced business and continued therein throughout 1960 and until May 1961. During this period they operated the business at a substantial loss, but at all times made the required payments on the purchase contract and the required rental payments due Hardy under the lease.

In the early part of 1961 plaintiffs were advised by Hardy that when the lease expired on June 1, 1961, he would not renew it for any additional period. It is their claim that until then they were not aware that the lease did not contain a 5-year renewal option as they claimed had been represented to them by defendants. In an effort to continue the business, they attempted to find another suitable location in Marshall but found none available. Accordingly, in the latter part of April 1961 they advertised and conducted a "closing-out" sale in which they disposed of as much of their stock of merchandise as possible. Thereafter, they discontinued business and removed some of the store fixtures and placed them in storage.

It is admitted by Hardy that at the time plaintiffs purchased the business he had already determined not to renew the store lease and upon its expiration to rent the premises to a Mr. Grue, his tenant in an adjoining store; and that this had never been disclosed to plaintiffs.

Lester Watkins testified that in November 1959, prior to execution of the purchase agreement, he had discussed the lease with George Lorenz in the presence of Hardy and had then asked Hardy if the lease contained a 5-year renewal option and that Hardy had not stated anything to the contrary; that Lorenz had then repeated his previous statement to the effect that the lease had a 5-year renewal option and could be renewed for an additional 5-year period upon its expiration and that Hardy had remained silent. At no time was a copy of the lease submitted to plaintiffs, and they had not read it before they were notified there would be no renewal thereof.

Hardy denied that such a conversation had taken place and testified that he had not met plaintiffs until subsequent to their execution of the purchase agreement and after they had already commenced business; that at that time Mr. Watkins had asked him if he could get an extension of the lease and that he had said, "I never give an extension of the lease to anybody, * * * I can't tell you right now. * * * That is all that was said."

Mr. Haynes testified that when the business was listed with him for sale by the Lorenzes, Mr. Lorenz had assured him that the lease contained a 5-year renewal option; that when he conferred with plaintiffs with respect to their purchase of the business he had advised them that the lease would expire in 2 years, but contained a 5-year renewal option; that when he introduced plaintiffs and the Lorenzes, Mr. Lorenz had stated to plaintiffs that the lease had a 5-year renewal option. Subsequent to the sale to plaintiffs, Haynes was paid his commission for the sale by Mr. Lorenz.

George R. Lorenz testified that there could have been some conversation between him and Haynes regarding the 5-year renewal option; that he could have said, "I have always rented from Mr. Hardy * * * and I feel sure that I will have no trouble getting an extension on the lease or a new lease"; that he first introduced plaintiffs to Hardy

about the middle of December a week or two after they had started in business, and that at that time he had said to Mr. Hardy, "I have always had the right to renew it, and do they have that same right?" and that he thought—although he was not positive—that Mr. Hardy had then said, "I don't see why not." Later, when he found out that Hardy would not renew the lease, he had asked Hardy why and Hardy had replied that the adjoining tenant had been in the building for so many years that he was entitled to it and that he (Lorenz) had then said that "it would be too bad if they [plaintiffs] had to go out of business" and that Hardy had said he thought they "could get another location" and that "it wouldn't do him any harm to get another location."

With respect to damages, the record discloses that Mr. and Mrs. Watkins testified that after they purchased the business and commenced its operation almost from the outset it showed a loss; that for the year 1960 such loss was approximately $2,000; that their initial investment in the business was the sum of $500 which had been paid to the Lorenzes as a downpayment on the purchase price; that almost all of their merchandise had been purchased on credit; that the store fixtures at the time of the removal for storage were in Mr. Watkins' opinion worth from $1,015 to $1,040. No testimony was submitted as to the value of the business at the time of its purchase with a lease extending for approximately 6½ years, as plaintiffs claim was represented to them, and as to its value with a lease extending for a period of approximately 1½ years, as was actually the case.

With respect to the issue of damages, the court instructed the jury as follows:

"* * * The damages in an action for false representation are the natural and proximate loss sustained by the parties because of reliance thereon. Matters which you may consider in determining damages in this case * * * are the difference in value between what was given and what was actually received; * * * the difference of the value between a jewelry business with a lease of the property for one and one-half years and the value of a jewelry business with a lease for six and a half years. This is not necessarily the only measure or the limit of damages. * * *

"In awarding damages * * * you should know that regardless of the outcome of this action, the contract between the plaintiffs and the Lorenzes is still a legal obligation, and the plaintiffs * * * would have an obligation to pay the balance under the contract for purchase, so that such balance due should be considered by you as a sum which will not automatically be canceled in the event you find that plaintiffs are entitled to recover. * * *

*     *     *     *     *

"* * * the party claiming damages * * * have an obligation under the law to take whatever steps may be reasonable under all the circumstances to reduce or diminish the damage which they claim to have suffered. * * * so, in this case, * * * the question arises as to whether or not there was available to plaintiffs any reasonable opportunity to find another location and thereby reduce the loss."

1. It seems clear that the evidence here was insufficient to support the jury's verdict on the issue of damages or to justify a determination of damages based upon the difference between what was given for the business upon the assumption that it included a lease for 6½ years and its value on the date of purchase with a lease for but 1½ years. The rule is well established that, in actions for damages based upon fraud or misrepresentations inducing the purchase of a business, the losses sustained by the purchaser as a natural and proximate result of the fraud are recoverable. In such cases ordinarily damages would include the difference in value of what was given and of what was received. Perkins v. Meyerton, 190 Minn. 542, 251 N. W. 559; Rosenquist v. Baker, 227 Minn. 217, 35 N. W. (2d) 346. As stated in Lehman v. Hansord Pontiac Co. Inc. 246 Minn. 1, 10, 74 N. W. (2d) 305, 311:

"* * * Minnesota has never accepted the so-called 'benefit-of-the-bargain' rule as applicable to the law of damages in actions for deceit, but has adopted and consistently applied what is referred to as the 'out-of-pocket' rule. * * * In short the measure of damages under the 'out-of-pocket' rule in deceit actions is the loss naturally and proximately resulting from the fraud, and it will usually be the difference between what the plaintiff parted with and what he got. 8 Dunnell,

Dig. (3 ed.) § 3841. It is therefore not a question of what the plaintiff might have gained through the transaction but what he lost, by reason of defendant's deception."

Under this rule it would seem that here the proper measure of damage was the difference between the amount plaintiffs paid for the business on November 30, 1959, contemplating a lease extending for 6½ years, and its actual valuation on that date with a lease extending for 1½ years. In addition, they would be entitled to any incidental damages flowing from the fraud or misrepresentation. Sampson v. Penney, 151 Minn. 411, 187 N. W. 135; Hatch v. Kulick, 211 Minn. 309, 1 N. W. (2d) 359; Lowrey v. Dingmann, 251 Minn. 124, 86 N. W. (2d) 499. Thereunder, they would be entitled to the reasonable value of their services or other expenditures made in conducting the business upon the assumption that they had 6½ years for such purpose, offset by any withdrawals. Any award in their favor, of course, would ultimately be offset by the unpaid balance due from them on the purchase price, which is not involved in the present action. It must follow that the instructions referred to were in error and accordingly that a new trial must be granted.

2. We do not find error in the trial court's admission of oral testimony as to defendants' representations to plaintiffs that the store lease contained a 5-year renewal option. It is well settled that evidence is admissible to establish fraud, even though in effect such evidence may contradict some of the terms of a written contract, when taken as a whole it tends to prove that such contract was induced by the alleged fraud. Remington v. Savage, 148 Minn. 405, 182 N. W. 524; Rosenquist v. Baker, *supra*; Nelson v. Moore, 193 Minn. 455, 258 N. W. 828; Bakke v. Keller, 220 Minn. 383, 19 N. W. (2d) 803; Nelson v. Berkner, 139 Minn. 301, 166 N. W. 347. Thus, in Rosenquist v. Baker, *supra*, which was an action for fraud in the sale of a restaurant, testimony as to a telephone conversation between plaintiff and defendant, wherein plaintiff was informed or led to believe that a 1-year lease on the premises was by its terms renewable, was held admissible and the parol evidence rule not applicable where plaintiff's reliance on such representation was reasonable. Here, although

the written purchase agreement specified that the store lease extended to June 1, 1961, plaintiffs testified that both defendant George Lorenz and his agent Haynes had orally represented to them that the lease contained a 5-year renewal option and this was confirmed by Haynes in his testimony. Accordingly, under the decisions cited such testimony was clearly admissible, since it appears the jury could find that plaintiffs had placed their reliance upon such representations. See, also, Aronovitch v. Levy, 238 Minn. 237, 56 N. W. (2d) 570, 34 A. L. R. (2d) 1306; Anchor Cas. Co. v. Bird Island Produce Co. 249 Minn. 137, 82 N. W. (2d) 48.

3. Whether Hardy was a party to the fraud practiced upon plaintiffs would be dependent upon the jury's determination. If it believed that he had acquiesced therein by remaining silent while aware that plaintiffs were being induced to enter into the purchase agreement on the assumption that the lease might be extended for an additional 5 years from its expiration date, he would be liable for any damages sustained by them as a result. 8 Dunnell, Dig. (3 ed.) § 3823. Of course, if the jury determined that plaintiffs had entered into the agreement and commenced business *prior* to any conversations with Hardy, it would seem clear that in so doing they had placed no reliance upon any acts, omissions, or statements of his, and that his silence had not been an inducing factor in plaintiffs' execution of the agreement. Nilsen v. Farmers State Bank, 178 Minn. 574, 228 N. W. 152; Rien v. Cooper, 211 Minn. 517, 1 N. W. (2d) 847. As indicated above, the determination of these questions was clearly a matter for the jury.

4. Further, it seems likely that the court's instructions after the jury first returned its verdict as above described may have misled the jury in subsequently determining the liability of the respective defendants, and in fixing the amount of its award. At that time in response to a juror's question as to whether the court would apportion among the defendants any verdict returned, the court advised the jury that it would do so, and with this in mind the jury resumed its deliberations. Had it then been advised that all defendants would be jointly and severally liable under any verdict returned, there might have been a different result. Under our decisions an attempt by the jury to ap-

portion its verdict ordinarily does not vitiate such verdict. Bakken v. Lewis, 223 Minn. 329, 26 N. W. (2d) 478; cf. Robyn v. White, 153 Minn. 76, 189 N. W. 577. In these cases, however, it does not appear that the jury resumed deliberations under the misconception which prevailed here. Under the circumstances described, we are of the opinion that in the interests of justice a new trial should be granted on all issues.

Reversed and new trial granted.

Mr. Justice Sheran, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.