James E. **KLAPMEIER**, Jack Dekker, Zaven Dadekian, and Dave Wilbourn, Plaintiffs-Appellees,

v.

**TELECHECK INTERNATIONAL, INC.**, a Delaware Corporation, Harry M. Flagg, and George L. T. Kerr, Defendants-Appellants.

No. 72–1219.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 12, 1973.

Decided June 26, 1973.

Richard S. Weiner, Los Angeles, Cal., for Telecheck.

Peter Dorsey, Minneapolis, Minn., for Flagg.

Richard B. Solum, Minneapolis, Minn., for Kerr.

S. W. Rider, Jr., Minneapolis, Minn., for plaintiffs-appellees.

Before MATTHES, Chief Judge, BRIGHT, Circuit Judge, and TALBOT SMITH, Senior District Judge.*

BRIGHT, Circuit Judge.

The stockholders of Boatel, Inc. (Boatel) agreed to exchange all of the capital stock of their corporation, which was engaged in the manufacture of pontoon boats, houseboats, dairy equipment, and snowmobiles in the community of Mora, Minnesota, for stock of Telecheck, Inc. (Telecheck), a Hawaiian-based corporation. James E. Klapmeier, plaintiff-appellee, the president and principal stock-

* Eastern District of Michigan, sitting by designation.

holder of Boatel, for himself and the other Boatel stockholders, negotiated with defendant-appellant, Harry M. Flagg, Klapmeier's friend and fraternity brother of his earlier college days at MIT. On May 10, 1969, the parties executed an agreement having the effect of merging Boatel into Telecheck. Thereafter, the old school ties proved too fragile to withstand business disagreements. In February of 1970, Telecheck fired Klapmeier, who at that time was the chief executive officer of its Leisure Time division (formerly Boatel). Klapmeier later that year responded with a suit for eight million dollars against Telecheck, Flagg, and other directors of Telecheck, alleging common law fraud and violations of the Federal Securities laws. Other minority stockholders of Boatel, who had been fraternity associates and friends of Klapmeier and Flagg at MIT, joined as plaintiffs. Telecheck counterclaimed, seeking damages in excess of five million dollars for breach of express warranty, for misrepresentations of the value of Boatel's assets and for common law and securities fraud allegedly committed by Klapmeier and other Boatel stockholders.

Following a three-week trial, a jury awarded appellees $857,632 against Telecheck, its president, Flagg, and its secretary-director-lawyer, George L. T. Kerr. The action against the other directors was dismissed by order of the court as to some and by the verdict of the jury as to others. Following unsuccessful post-trial motions for judgment n. o. v. or for a new trial, Telecheck, Flagg, and Kerr prosecute this appeal. After a careful review of a most extensive record, we reject the appeal on all grounds except that we hold the award of damages excessive as not supported by substantial evidence. We reverse and remand for a new trial on damages.

Appellants raise the following issues:

(1) That the damages were excessive.

(2) That the exchange of stock was exempt from registration under the Securities Act of 1933, and that therefore the trial court erred in submitting to the jury the question of Telecheck's failure to register.

(3) That the trial court erred in permitting oral testimony to be introduced which varied from the provisions of the written agreement of merger.

(4) That the appellant Telecheck sustained prejudice in attempting to recover upon its counterclaim by instructions that required that Telecheck establish elements of common law fraud as a prerequisite to recovery based on violations of the federal securities laws.

(5) That the appellant Telecheck should be granted a new trial on its counterclaim because the jury returned a verdict which did not indicate any decision on the counterclaim.

Appellant Kerr separately contends (a) that the trial court erred in denying him judgment of dismissal n. o. v. since the jury verdict against him lacked any evidentiary support or (b) that he should have a new trial because of error in instructions relating to the personal liability of a "controlling person" of a corporation.

We consider these issues against the backdrop of relevant facts developed at trial. Boatel, a small company with annual sales under one million dollars, exhibited fair success[1] in its business until 1967, when it experienced heavy financial losses incident to its performance of a contract to construct landing craft for the United States Navy. That year, on sales of 1.9 million dollars (non-Navy sales, 1.4 million dollars; Navy, $500,000) it experienced a loss of $72,000, and in the following nine months of 1968, on combined Navy and non-Navy sales of 2.2 million dollars, Boatel incurred a loss of about $400,000. As a result of these financial difficulties, Boatel's creditors sought to declare

---

1. 1964—profit of $10,000 on sales of $600,000.

1965—loss of $9,000 on sales of $600,000.
1966—profit of $14,000 on sales of $800,000.

Boatel a bankrupt in the spring of 1968. Boatel, in response to the creditors' petition, obtained permission from the bankruptcy court to attempt to reorganize under Chapter XI of the Bankruptcy Act, thus holding the creditors' petition for involuntary bankruptcy in abeyance, while Boatel remained in possession of its assets.

In April of 1968, Flagg wrote Klapmeier a friendly letter offering advice, having learned of these financial difficulties from appellee Dave Wilbourn, a minority stockholder in Boatel. Klapmeier and Flagg exchanged correspondence. The correspondence flowered into visits to Minnesota by Telecheck personnel, a meeting between Klapmeier, Flagg, and others in Minnesota in November of 1968, and another meeting in Honolulu in mid-December of the same year. During these meetings, Klapmeier and Flagg engaged in negotiations looking toward Telecheck's acquisition of Boatel by merger. Further negotiations took place in Minneapolis, Minnesota, in January of 1969, culminating in the execution of an agreement on January 11, in which Boatel's stockholders granted Telecheck an option until the summer of 1969 to acquire all of Boatel's stock. The option provided that Telecheck could acquire all of the shares of Boatel for a consideration of not less than $1,000,000 worth of Telecheck stock, provided Boatel had completed its Chapter XI proceedings by March 7, 1969. The consideration decreased to not less than $600,000 worth of stock if Telecheck exercised its right under the option agreement to terminate the Chapter XI bankruptcy by settling with Boatel's creditors after March 7, 1969.

Boatel's plan of reorganization submitted to the referee in bankruptcy in the Chapter XI proceeding called for paying general creditors 20 percent of their claims on a deferred basis. In late January of 1969, following the execution of the option agreement, the referee rejected this plan. Boatel's financial situation then became extremely precarious. Telecheck advanced it $100,000 by way of a loan to enable it to continue its operations. Telecheck then advanced about $250,000 to the bankruptcy court on March 14, 1969, under an approved plan by which Boatel's creditors would receive an immediate payment of 20 percent of their claims.

On May 10, 1969, the parties signed an agreement under which Boatel's stockholders agreed to transfer all 5,200 outstanding shares (about 61 percent owned by Klapmeier and about four percent by other appellees) to Boatel in exchange for a minimum of $1,000,000 worth of Telecheck stock, subject to certain provisions. The agreement provided for immediate delivery of 18,000 shares of Telecheck stock to the Boatel stockholders. This was lettered stock to be held for two years as an investment. The balance of stock called for under the agreement would be delivered in 1971. The total number of shares which Telecheck was obligated to deliver above a guaranteed minimum depended on the future profits of Boatel. If earnings reach certain specified levels in 1969, 1970, and 1971, Boatel's stockholders would receive additional shares, not to exceed a total of 165,000 shares of Telecheck stock. The agreement also specified that Boatel's stockholders would receive shares of Telecheck having a fair market value of no less than $1,000,000 in the aggregate, valued at the close of Telecheck's fiscal year ending May 31, 1971.[2]

Following the close of the 1969 fiscal period, the consolidated statement of Telecheck's operations showed $50,000 of ordinary profits from the Boatel division, as well as $350,000 in "extraordinary" gains, which gains represented no more than the decrease in Boatel's liabil-

2. Klapmeier testified of his understanding that Boatel's stockholders under the agreement were entitled to a minimum of 120,000 shares and a maximum of 165,000 shares.

ities caused by the 20 percent settlement of the claims of Boatel's creditors.

Telecheck's assumption of Boatel's operations proved financially disastrous. It advanced over $285,000, including the $250,000 deposited initially with the bankruptcy court, to extricate Boatel from the Chapter XI bankruptcy proceedings. Following the exercise of the option, it advanced Boatel, as a division of Telecheck, over two million dollars as operating capital. At the end of the fiscal year 1970 (May 31, 1970), the Boatel operations showed earnings losses of nearly $700,000. Telecheck stock, which had been listed on the Honolulu Stock Exchange at a high of $21 per share in March of 1969, sold at nearly $6 at the institution of this suit in May of 1970, and was near $2 during trial. In May of 1971, at the termination of the two-year "lettered" period, Telecheck shares were listed at $5.50–$5.75 per share.

Klapmeier and the other appellees alleged as the basis of their suit that Telecheck made the following statements, which constituted actionable misrepresentations, in order to induce Klapmeier and others to transfer all of Boatel's shares to Telecheck:

(1) That Telecheck falsely stated that Klapmeier and others of Boatel would be given employment contracts and named to a Telecheck policy committee.

(2) That Telecheck falsely stated that it possessed the ability to provide management techniques and computer controls to enable Boatel to operate profitably and effectively.

(3) That Telecheck falsely represented its operating subsidiaries as profitable operations, and that it possessed adequate financial resources to enable Boatel to become a leading producer of boats and snowmobiles.

(4) That Telecheck misrepresented the profit potential and the financial status of its previously acquired corporation, Pacific Submersibles, Inc. (PSI), an underwater research firm, by using fraudulent accounting techniques which it did not disclose to Klapmeier.

This charge needs some additional explanation. Telecheck had acquired 40 percent of the stock of PSI in mid-1968, along with the voting rights to the other 60 percent. Although Telecheck thus acquired actual control of PSI, it did not include an operating statement of PSI or PSI assets and liabilities in its (Telecheck's) consolidated balance sheets and operating statements. It declined to do so on the basis that Telecheck actually owned less than a majority of PSI stock. Telecheck then arranged transfers to it of PSI assets. These assets were carried at low value on PSI's books, but were transferred to Telecheck at greatly enhanced values. These transfers were shown by bookkeeping entries. No actual cash exchanged hands. In this way Telecheck fictitiously increased its own asset picture. Through intercorporate transactions with PSI, Telecheck also showed a greater profit by making substantial charges against PSI for management fees. The appellees introduced testimony indicating that since Telecheck actually controlled PSI, proper accounting practices dictated that these intercorporate transactions be deemed intracorporate, and disregarded on Telecheck's books.

The evidence showed PSI to be an insolvent company. But Telecheck, through its president, Flagg, did not disclose the true financial picture of PSI, but painted PSI as a prosperous subsidiary possessing great profit potential.

Telecheck in turn contended that Klapmeier had overstated Boatel's net worth and profit capabilities, and that these misrepresentations had led Telecheck into an improvident acquisition of Boatel which caused Telecheck to experience a financial disaster.

We now examine the questions on this appeal.

## I.

## DAMAGES

As has been mentioned, the appellees owned approximately 65 percent of Boa-

tel. The court instructed the jury to award damages, if any, to appellees based upon the market value of their Boatel stock as of January 11, 1969, (the date of the option agreement) plus interest at six percent per year, minus what appellees had received from Telecheck.

Appellees introduced testimony from Robert Zicarelli, an expert in the analysis of investments, who valued Boatel at $1,250,000 as of January 11, 1969. However, this evaluation was predicated upon certain assumed factors, such as the accuracy of Boatel's financial statements and its successful completion of Chapter XI proceedings. But according to Zicarelli's testimony, his $1,250,000 valuation for Boatel would be reduced by the amount which was necessary to remove Boatel from the Chapter XI proceedings. The evidence showed this figure as $285,553. Based on this evidence, appellees' damages for their 65 percent interest could amount to no more than $626,890.55. This sum does not take into account any inaccuracy in Boatel's financial statements, some amount which appears to be conceded by appellees.

■ Appellees also presented testimony of one Snellen Johnson, who stated he had proposed the formation of a new company for the marketing of recreational equipment such as boats and snowmobiles, with a public sale of shares of stock to finance the undertaking. While the formation of this conglomerate was in its planning stage, he offered Boatel "3 million dollars worth of the stock in our company." However, this public offering never materialized. Because his statement of value was based on pure speculation, the evidence lacks any probative effect. *See, e. g.,* United States v. Smith, 355 F.2d 807, 811 (5th Cir. 1966); Liflans Corporation v. United States, 390 F.2d 965, 969, 182 Ct.Cl. 825 (1968).

Boatel stock, prior to the bankruptcy proceedings, had sold for $100 per share in a few private sales between Klapmeier or members of his family and Klapmeier's friends. This valuation would not justify any amount in excess of $338,000.

■ Fair market value, of course, represents the price at which a willing seller and a willing buyer will trade, both having a reasonable knowledge of the facts. Hamm v. Commissioner of Internal Revenue, 325 F.2d 934, 937 (8th Cir. 1963); Dempsey v. Stauffer, 312 F.2d 360, 365 (3d Cir. 1962); Goldstein v. Commissioner of Internal Revenue, 298 F.2d 562, 567 (9th Cir. 1962). Another criterion of market value is the actual sales price. *See* Boise National Leasing, Inc. v. United States, 389 F.2d 633, 638 (9th Cir. 1968); Wolff v. Commonwealth of Puerto Rico, 341 F.2d 945, 947 (1st Cir. 1965); Douglas Hotel Co. v. Commissioner of Internal Revenue, 190 F.2d 766, 772 (8th Cir.), cert. denied, 342 U.S. 893, 72 S.Ct. 200, 96 L. Ed. 669 (1951). Here, the actual sales price of Boatel on January 11, 1969, could be measured by the guarantee which was written into the option agreement, totalling not more than one million dollars worth of stock, nor less than $600,000 worth of stock, the final figure dependent upon the results of the Chapter XI proceeding. Measured by the maximum guarantee possible, the appellees, as owners of 65 percent of the stock, would be entitled to no more than $650,000, plus interest, with that figure reduced by the value of about 13,000 shares of Telecheck stock delivered to them on May 10, 1969. At that time Telecheck shares were listed as selling in the $16.75 range. This stock was subject to a two-year holding period, and as lettered stock its value would be reduced from 15 percent to 50 percent, according to testimony proffered by expert witness Zicarelli. At the expiration of this two-year period, when these shares became fully marketable, the Hawaiian Exchange listed their value near $6 per share. This testimony provided a wide range within which the jury could compute the value of these shares received from Telecheck. Based on the actual sales price less credit for part of the

price already received, appellees' damages do not closely approach the jury award of $857,632.

■ Only the testimony of Klapmeier, as an owner, offering an opinion of three to four million dollars as the value of Boatel, supports the jury's award. Although Klapmeier, as an owner of the property in question, may properly testify to its value, *see* United States v. 3698.63 Acres of Land, etc., North Dakota, 416 F.2d 65, 67 (8th Cir. 1969); Berkshire Mutual Insurance Co. v. Moffett, 378 F.2d 1007, 1011 (5th Cir. 1967); *see also* Righter v. United States, 439 F.2d 1204, 1210, 194 Ct.Cl. 400 (1971), we do not believe his testimony here has sufficient probative force to permit us to sustain the verdict.

In estimating the value of Boatel as of January 11, 1969, Klapmeier assumed that Boatel would successfully emerge from its Chapter XI proceeding by compromising creditors at 20 percent of their claims on a deferred basis.[3] This estimate thus ignored 80 percent of actual creditors' claims against the company and rested upon circumstances not yet in existence. Moreover, according to Klapmeier's subsequent testimony, he relied on other business transactions for comparison. Some of these other transactions apparently were corporate mergers, and not ordinary sales. As to others, no attempt was made by appellees to show whether these transactions involved similar businesses which were subject to Chapter XI or other bankruptcy proceeding, as was the case with Boatel. With this background of testimony, we must conclude that Klapmeier's testimony, since resting at least in part on speculative factors, cannot itself support the

award. *Cf. 3698.63 Acres, supra,* 416 F.2d at 68.

Appellees argue that a Telecheck internal memorandum supports the jury award by showing that Telecheck valued Boatel at between $2,637,000 and $2,475,000. We have reviewed this exhibit and find no such estimate of market value contained therein, but merely a statement converting the terms of the option agreement into cash value based on an assumed $15 per share value of Telecheck stock, and assuming high or medium profit levels for future operations of Boatel as a subsidiary of Telecheck.

■ We conclude that no substantial evidence supports the jury award in this case.

## II.

### REGISTRATION

■ The parties concede that Telecheck did not register its stock prior to the signing of the agreement between the parties in accordance with the requirement of § 5 of the Securities Act of 1933, 15 U.S.C. § 77e. However, appellants vigorously press the argument that the trial court erred when it declined to rule the transfer of Telecheck stock to be an exempt private offering of securities under § 4(1) of the Securities Act of 1933, 15 U.S.C. § 77d(2).[4] Both sides agree that Securities and Exchange Commission v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953), is the controlling authority. In the *Ralston Purina* case, a corporation sold nearly $2,000,000 worth of its stock to employees without registering

3. The crucial question and answer as put to Klapmeier reads as follows:

Q. As owner of that amount of stock of Boatel, and as president of the company in that time as of January 11, 1969, did you have an opinion as to the fair market value of Boatel, assuming that there'd be an eventual approval of a reorganization plan to eliminate the creditors along the lines pending at that time?

\* \* \* \* \*

Q. My question was did you have an opinion at that time?
A. Yes, sir.
Q. Would you state what your opinion was?
A. I felt that the whole company would be worth from three to four million dollars \* \* \*.

4. This section exempts from registration "transactions by an issuer not involving any public offering."

the sale. The Court held these transactions to be nonexempt, stating:

> Exemption from the registration requirements of the Securities Act is the question. The design of the statute is to protect investors by promoting full disclosure of information thought necessary to informed investment decisions. The natural way to interpret the private offering exemption is in light of the statutory purpose. Since exempt transactions are those as to which "there is no practical need for [the bill's] application," the applicability of § 4(1) should turn on whether the particular class of persons affected needs the protection of the Act. An offering to those who are shown to be able to fend for themselves is a transaction "not involving any public offering." [346 U.S. at 124–125, 73 S.Ct. at 984 (brackets in original; footnote omitted).]

The Court added:

> The focus of inquiry should be on the need of the offerees for the protections afforded by registration. The employees here were not shown to have access to the kind of information which registration would disclose. [346 U.S. at 127, 73 S.Ct. at 985.]

We think it doubtful that the registration provisions apply to the instant transaction, for the record undisputedly discloses a stock-for-stock exchange for investment purposes between Telecheck and only seven stockholder-owners of Boatel, who permitted Klapmeier to negotiate the merger agreement. Klapmeier received all published financial statements of Telecheck, plus the opportunity to explore fully the operations of Telecheck and its subsidiaries during his four-day Hawaiian visit in December, 1968. Under these circumstances, we find it most difficult to characterize the offering as one other than nonpublic. See Woodward v. Wright, 266 F.2d 108, 115 (10th Cir. 1959). See generally, 1 L. Loss, Securities Regulations 653–696 (2d Ed. 1961).

A dispute in testimony developed as to whether Klapmeier, on his visit to Hawaii in December, 1968, had reviewed an SEC Form 10, which contained detailed financial information concerning Telecheck's operations, and which was being prepared for submission to the SEC. This form apparently disclosed the true financial status of PSI and its financial transactions with Telecheck. While the appellees concede that during the Hawaiian visit Klapmeier spent a great deal of time with Telecheck personnel, closely examined the operations of the corporation, and received all the published financial statements of Telecheck, the appellees nevertheless argue that the factual dispute over whether Klapmeier received the Form 10 information makes the question of registration one for the jury. In making this contention, appellees would make the exemption rest on the fact of knowledge by the offeree rather than the offeree's access to information and his need for protection. Ralston Purina speaks both in terms of the exemption turning "on the knowledge of the offerees," Ralston Purina, supra 346 U.S. at 126, 73 S.Ct. at 985, as well as "access to the kind of information which registration would disclose." Id. at 127, 73 S.Ct. at 985. The issue is not free from difficulty.

We need not, however, finally resolve this question here. Appellants argue that if the transfer of Telecheck stock need not have been registered, the jury verdict cannot stand, since the jury may have based its verdict exclusively upon Telecheck's failure to register. However, the very evidence in this case from which a jury might infer that registration was required to protect the appellees, also tends to establish Telecheck's violation of § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2), and SEC Rule 10b–5, 17 C.F.R. 240.10b–5. If the jury found that Telecheck failed to disclose pertinent information concerning PSI, such a finding would not only establish Telecheck's liability for failure to register its stock, but would also establish Telecheck's liability for misrepresentation of its financial status. Thus, we see no prejudice to appellants in this case by the submission of the

registration issue, and see no need for a new trial.[5]

## III.
## INSTRUCTION ON COMMON LAW FRAUD

■ We next examine Telecheck's contention that it was prejudiced in its counterclaim because the trial court erroneously indicated that scienter and reliance, both elements of common law fraud, also were elements of causes of action under § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2), and Rule 10b–5, 17 C.F.R. § 240.10b–5.

The court properly instructed the jury on the applicable securities statutes and Rule 10b–5, followed with an instruction on common law fraud, and then interjected the following:

> Insofar as I have read to you sections of the Securities Act which are referred to as the Regulation 240.-10b–5, and 77l(2)—in general, those same requirements apply. The Securities Act, insofar as those provisions are concerned, irrespective of registration, are to some extent a restatement, or an embodiment of the common law principles of fraud, and I've given you the six elements, now, that comprise the fraud, and I've stated it to you in different ways. And if you find that either of the parties, either side, or any of the parties have established each of these elements by a preponderance of the evidence, then you should return a verdict for them. If, on the other hand, you find that either party has failed so to establish in any one or more of these six elements, then you must find that there was no fraud.

The effect of this statement, according to appellants' argument, engrafted the elements of common law fraud, the subject of the above instruction, onto the previous instruction of the court relating to the claims of misrepresentation arising under the securities laws.

■ However, following the instruction of the jury, the court gave counsel for both sides an opportunity to object. In response, appellants' counsel requested a modification of the instruction on damages, and also expressed concern over the clarity of the court's instruction on appellants' counterclaim. The court thereafter corrected its instructions as to those matters. But the appellants gave the trial court no opportunity to correct the questioned instruction as appellants were bound to do to preserve error under Rule 51, Fed.R. Civ.P., notwithstanding that the trial court denied appellants' requested instruction covering generally the same subject matter. Fulton v. Chicago, Rock Island and Pacific Railroad Co., 481 F. 2d 326 (8th Cir. 1973).

Moreover, here, the court's comments on this aspect of the case served to bolster appellants' own defense against the appellees' claims for violations of the securities laws by engrafting conditions on recovery not encompassed within the relevant statutes. The instruction "cut both ways." Appellants not having made specific objection, and having received a benefit from this instruction, will not now be heard to complain.

## IV.
## VERDICT FORMS

The jury returned a verdict form on the appellees' suit. Although furnished

5. We find the cases cited by appellant to be inappropriate. *See, e. g.,* Albergo v. Reading Company, 372 F.2d 83 (3d Cir. 1966), cert. denied, 386 U.S. 983, 87 S.Ct. 1284, 18 L.Ed.2d 232 (1967); Fatovic v. Nederlandsch-Ameridaansche Stoomvaart, 275 F.2d 188 (2d Cir. 1960); Berg v. Union State Bank, 186 Minn. 529, 243 N.W. 696 (1932); Gamradt v. DuBois, 176 Minn. 312, 223 N.W. 296 (1929). These cases hold that when two causes of action are presented to a jury in the form of a general verdict, and only one cause is supported by the evidence, a new trial must be ordered. This is to insure that the jury properly performs its function as the factfinder. Here, however, the proof of one cause in question, if accepted by the jury, establishes the existence of the alternative claim which was properly submitted to the jury.

appropriate forms for such a verdict, it failed to return a verdict either for or against the counterclaimant Telecheck. Appellant Telecheck argues that "[t]he jury instructions given by the trial court confused the jury so much that they were unaware that they were to decide *two* cases: the plaintiffs' claim and TCI's counterclaim."

The trial judge did not receive the verdict as he was outside Minnesota fulfilling other commitments. He arranged for Circuit Judge Heaney, who resides at Duluth, Minnesota, where this case was tried, to receive the verdict and to reread the instructions if necessary. Judge Heaney polled the jury on receipt of the verdict but did not inquire regarding the counterclaim. Neither counsel for appellants nor counsel for appellees were present to assist the court.

The jury had been given four verdict forms: one for the appellees on their claims, one for the appellants on the appellees' claims, one favoring the appellants on their counterclaim, and one favoring the appellees on the appellants' counterclaim. The court advised the jury that:

> Forms of verdict have been prepared for your convenience, and I'm going to read them to you, and whichever one is used will—I should say one, or ones, I think—is used will be signed by your foreman, or forelady and dated.

The jury returned only one form, that favoring the appellees.

 In an unpublished post-trial memorandum opinion denying appellants a new trial, the district court determined that a reasonable inference could be drawn that the jury's use of one verdict form constituted an adverse finding against appellants on all other issues.

6. Section 20 of the 1934 Act reads in part:
 Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled

The trial court also ruled that the appellants waived any objection to the form of the verdict which the jury returned (1) by failing to object to instructions relating to the verdict forms, and (2) by failing to be present in the courtroom at the return of the verdict so as to move for resubmission of their counterclaim. We agree with the trial court's disposition of this issue and we adopt his reasons as stated in his memorandum opinion.

## V.

### OTHER MATTERS

Liability of appellant Kerr rested upon the "controlling person" provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934.[6]

 After a careful review of the record, we are satisfied that the status of Kerr as a controlling person raised a question for the jury. The jury could infer that the principal business of Telecheck was that of acquiring other businesses in order to inflate the market price of its stock. Kerr served on the board of directors and executive committee of Telecheck and was its secretary. In addition, he served as secretary of PSI and had participated in its acquisition. He participated in the merger of Telecheck and Boatel. An acceptable implication from the evidence is that Kerr exercised some influence over the corporate acquisitions of Telecheck. In *Myzel v. Fields*, 386 F.2d 718 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S. Ct. 1043, 19 L.Ed.2d 1143 (1968), in discussing the liability of a controlling person under 15 U.S.C. § 78t, we said:

> The statute is remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a "controlling person" liable. [*Id.* at 738.]

person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action. [15 U.S.C. § 78t(a).]
*See also* 15 U.S.C. § 77o.

On this record we cannot say that as a matter of law Kerr was not shown to be a controlling person of Telecheck. Further, the question of "good faith" properly rested with the jury.

■ We find no merit to appellants' claim that the trial court, in violation of the parol evidence rule, permitted Klapmeier to testify to certain promises made to him by Flagg which were in conflict with the terms of the agreement between the parties. Appellees brought this action, not for breach of contract, but for common law and statutory fraud and misrepresentation. Evidence is admissible to establish that a contract was induced by fraud, even when that evidence contradicts the terms of a written contract. *See* Watkins v. Lorenz, 264 Minn. 471, 119 N.W.2d 482, 488 (1963); Rosenquist v. Baker, 227 Minn. 217, 35 N.W.2d 346, 349 (1948).

Accordingly, while we affirm on the issue of liability, we remand for a new trial on the issue of damages. We allow appellants 25 percent of their costs on appeal.