BOWNES, Circuit Judge.
 

 This appeal follows an action brought by the trustee in bankruptcy of D. C. Sullivan Company against the defendants-appellants to recover the value of assets allegedly misappropriated from the bankrupt Sullivan Company. The appellants are Watts Detective Agency, Inc., the recipient of the assets, Consolidated Services Corporation, Watts’ parent corporation, and Christopher P. Recklitis, president of Watts and Consolidated (collectively, the Watts appellants); Daniel C. Sullivan, president and a director of the bankrupt company; and Billy R. Otte, vice-president and a director of the bankrupt. The complaint alleged three separate counts, each a different theory of liability, against all five defendants: (I) that within a year prior to Sullivan Company’s bankruptcy defendants caused to be transferred to Watts the company’s assets without fair consideration, rendering the company insolvent, in violation of the fraudulent conveyance section of the former Bankruptcy Act, 11 U.S.C. § 107(d)(2)(a) (repealed 1978);
 
 [1]
 
 (II) that defendants caused such transfer to be made within a year prior to the company’s bankruptcy with the intent to hinder, delay or defraud creditors in violation of former 11 U.S.C. § 107(d)(2)(d); and (III), a pendent state action claim, that Sullivan and Otte, in facilitating the transfer, breached their fiduciary duty to Sullivan Company and the other defendants all knowingly participated in the breach of duty. The jury found all five defendants liable for the fraudulent conveyance under Count I, found all defendants not liable on Count II, found only Sullivan and Otte liable for breach of fiduciary duty under Count III, and awarded damages to the trustee in the amount of $750,000.
 

 The defendants all moved for judgment notwithstanding the verdict pursuant to Federal Rule of Civil Procedure 50(b) and in the alternative for a new trial pursuant to Federal Rule of Civil Procedure 59(a). In a lengthy and thorough opinion the district court denied the various motions, from which decision defendants appeal in addi
 
 *732
 
 tion to appealing generally from the judgment on the grounds of claimed trial errors. The trustee cross-appeals the district court’s denial of his motion to alter or amend judgment to include prejudgment interest on the verdict and to enter judgment against Watts, Consolidated and Recklitis on Count III.
 

 We begin by setting forth the relevant facts, mindful that we review the evidence and inferences fairly drawn therefrom in the light most favorable to the prevailing party.
 
 DeVasto v. Faherty,
 
 658 F.2d 859, 861 (1st Cir. 1981);
 
 Engine Specialties, Inc. v. Bombardier Ltd.,
 
 605 F.2d 1, 9 (1st Cir. 1979),
 
 cert. denied,
 
 446 U.S. 983, 100 S.Ct. 2964, 64 L.Ed.2d 839 (1980).
 

 The evidence consisted largely of admitted facts and the testimony of Otte, Sullivan and Recklitis. The Sullivan Company was in the business of supplying security guards to businesses, industrial plants and others. Sullivan, who was president and a director, was in charge of the company’s finances. Otte, vice-president and a director, was in charge of general management of operations for the company. The company’s financial difficulties started pri- or to the time of the transfer at issue. Since 1968 it had owed the Internal Revenue Service for unpaid taxes which amounted by April 1970 to over $210,000. In 1969 and 1970 its sales were consistently exceeded by its disbursements, and for three weeks prior to the alleged transfer it issued payroll checks which were returned because of insufficient funds.
 
 [2]
 

 In May 1969 Recklitis, on behalf of Consolidated, negotiated with Otte over the possible purchase of the company. Nothing resulted from these negotiations. By early 1970 the IRS was pressing the company to pay its past due taxes, and, at that time, Otte and Recklitis met again to discuss a possible purchase by Consolidated or Watts.
 
 [3]
 
 In mid-April Recklitis made his first offer for the operating portion of the company’s business, i.e. its customer accounts, employees and goodwill. He offered to pay in installments for each of the succeeding four years an amount equivalent to five percent of that portion of the gross sales attributable to Sullivan Company customers. Because the approximate annual gross sales of Sullivan was one million dollars, this meant a contemplated purchase price of two hundred thousand dollars. Otte was offered a job with Watts as part of the deal. The offer to purchase the company was contingent on agreement by the IRS to settle its claim.
 

 Shortly after the offer was made, Otte telephoned all of Sullivan Company’s seventeen customers to advise them of the potential sale, to assure them of uninterrupted guard service and to learn which customers would remain. The customers apparently indicated they would remain with the new company provided there were continuity of service.
 

 This first offer by Recklitis was rejected by Daniel Sullivan as being too low. Within days, the IRS announced its intention to levy on Sullivan Company’s past accounts receivable which, as of April 20, 1970, amounted to approximately $38,000. Cash was needed by the company to meet its weekly payroll, which was over $15,000, and within a few days Recklitis made his second offer to purchase the company. This time the proposed price was $50,000 cash and two percent of the gross sales per year for four years, which, calculated in the same manner as the first offer, amounted to a purchase price of approximately $130,000. This offer was also contingent on IRS approval. Neither the first nor second Recklitis offer included the assumption of the debts of Sullivan Company; only its operations were the subject of the negotiations.
 

 On April 22, 1970, Recklitis, Otte and Sullivan met with representatives of the IRS in hopes of arriving at an arrangement that would meet with everyone’s satisfac
 
 *733
 
 tion. The IRS would not approve Recklitis’ second offer and, at 5:00 P.M. the IRS agent walked out of the meeting stating that the company’s accounts receivable would be levied upon the next morning. At that point, according to Otte, he, Sullivan and Recklitis believed that in light of the impending levies, the company was out of business. Recklitis then offered Otte a job with Watts, which Otte accepted, promising to contact the customer accounts and guards of Sullivan Company to try to secure them for Watts. According to Otte, Recklitis stated that “it’s a dirty way to do it, but these accounts are up for grabs.” During this conversation, Sullivan walked out “completely demoralized,” according to his testimony, and told Otte to do whatever he had to do. At no time did Otte and Sullivan discuss the effect of a Watts takeover on Sullivan Company’s creditors either with each other or with the other directors of the company.
 

 That evening and the next morning Otte, on behalf of Watts, began calling Sullivan Company customers and supervisory personnel to arrange for uninterrupted guard service. He conducted this activity from the Sullivan Company offices and continued to utilize the offices, telephone and records of the company for a brief period. Nine of the company’s former customers were serviced by Watts on April 23 and within several days Watts was servicing four more; of the seventeen customer accounts belonging to Sullivan Company on April 22, thirteen were ultimately serviced by Watts. In the year from April 23,1970, to April 22, 1971, Watts received approximately $680,-000 in gross sales from these former customers of Sullivan Company.
 

 The trustee alleged in his complaint that what was transferred to Watts fraudulently and as a breach of fiduciary duty were the “operating and administrative organization of the Sullivan Company, its employees, customers, goodwill and business.” All appellants argue that there was no evidence at trial that any “property,” as that term is used in the Bankruptcy Act’s fraudulent conveyance provision, was transferred.
 
 [4]
 
 In addition, they claim there was no proof of the amount by which the bankrupt’s estate was purportedly diminished. Sullivan also argues that there was insufficient evidence to show he participated in the fraudulent transfer (Count I) and that the evidence does not prove that he breached his fiduciary duty to the corporation (Count III). Otte adopts all the arguments of his co-appellants.
 

 Motions for Judgment N.O.V.
 

 Our standard of review of a denial of a motion for judgment notwithstanding the verdict is well settled. “The motion is properly granted only when, as a matter of law, no conclusion but one can be drawn.”
 
 Rios v. Empresas Lineas Maritimas Argentinas,
 
 575 F.2d 986, 990 (1st Cir. 1978).
 
 See also DeVasto v. Faherty,
 
 658 F.2d at 860;
 
 Hubbard
 
 v.
 
 Faros Fisheries, Inc.,
 
 626 F.2d 196, 199 (1st Cir. 1980).
 

 We turn first to appellants’ argument that no property of the bankrupt company was transferred to Watts.
 
 [5]
 
 Specifically, they claim: (1) that Otte and the Sullivan Company guards were not property; (2) that the Sullivan Company customers were not property of the bankrupt and that no protected list of customer names was transferred; and (3) that, because the Sullivan Company was no longer an ongoing business by 5:00 P.M. on April 22, no goodwill was transferred.
 

 
 *734
 
 The term “property” in the Bankruptcy Act “has been construed most generously” for the purpose of protecting the creditors of the bankrupt.
 
 Segal v. Rochelle,
 
 382 U.S. 375, 379, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966). Generally speaking, it is “anything of value — anything which has debt paying or debt securing power.”
 
 Pirie v. Chicago Title and Trust Co.,
 
 182 U.S. 438, 443, 21 S.Ct. 906, 908, 45 L.Ed. 1171 (1901).
 

 This expansive definition of property in the bankruptcy context is not limited to tangible assets. Items such as the customer routes of driver-salesmen for a pastry distributor could be property of the bankrupt company.
 
 In re Rubin,
 
 378 F.2d 104 (3d Cir. 1967). Milk routes, found to be of substantial value to a bankrupt dairy company, have been held to be property of the bankrupt’s estate.
 
 Summe v. Chapman Dairy Company,
 
 238 F.2d 3 (8th Cir. 1956).
 

 In
 
 Heyl v. Emery and Kaufman, Ltd.,
 
 204 F.2d 137 (5th Cir. 1953), the court found insurance policy “expirations” — information which represents the right to solicit renewals of customers — to be valuable property, and a bankrupt tenant’s month-to-month tenancy was held to be a valuable property right in
 
 Lesser v. Mendelson,
 
 352 F.Supp. 321 (S.D.N.Y.1971),
 
 aff’d sub nom. Lesser v. Jewel Factors Corp.,
 
 470 F.2d 108 (2d Cir. 1972). In both cases the courts, in ascribing value to these items, focused on the value to the bankrupt business of the expectation of continuity in these relationships.
 
 Heyl,
 
 204 F.2d at 140;
 
 Lesser,
 
 352 F.Supp. at 327.
 

 The trustee argues that the transfer to Watts of the Sullivan Company guards, customers and goodwill was essentially the transfer of the continuity of service of the company’s operation. In its opinion below the district court highlighted the company’s reasonable expectancy of continued relationships with its employees and customers and the value that this continuity imported to these relationships. There was evidence that Sullivan Company had maintained the loyalty of customers and employee guards for years. Sullivan testified that providing uninterrupted guard service “was everything” in keeping customers and that Otte was the key to this continuity. As a former FBI agent with contacts in the security community, Otte was successful at obtaining customers and retaining them in a highly competitive business. And, because of the high regard in which he was held by company employees, he was instrumental in keeping them over the years, which was the key to being able to continue to provide continual guard service to customers. In addition, there was evidence that a number of customers required guards with special security clearances and that, despite a general shortage of such guards, Sullivan Company was always able to provide them.
 

 The court engaged in a lengthy in-depth analysis of the transfers of the guards, customers and goodwill and held that they were each susceptible of having value and, therefore, of being “property” in a bankruptcy setting. We agree. We add, however, that what was transferred to Watts amounted in the aggregate to a transfer of the business itself. The whole was greater than its parts.
 

 The evidence showed that Otte’s relationships with the supervisors, guards and customers of Sullivan Company were what provided the necessary continuity for this service business. Recklitis was fully aware that because of the loyalty of the customers, supervisors and guards to Otte, he was the key to obtaining and keeping the company’s customers without a break in the continuity of operations.
 
 [6]
 
 Through hiring Otte, Watts was able to obtain thirteen out of Sullivan Company’s seventeen customers and enough of its guards and supervisors to continue providing service to these accounts.
 

 In short, the jury could have found on this evidence that, in hiring Otte, Watts effected the transfer of precisely that for which it had been bargaining previously with Otte and Sullivan and had been prepared, until the previous day, to purchase—
 
 *735
 
 the operating portion of the Sullivan Company business — and that this package was acquired by Watts on and after April 23, 1970.
 

 Turning to the problem of whether anything of real
 
 value
 
 (such as goodwill) was transferred to Recklitis, the critical fact question for the jury was whether or not at 5:00 P.M. on April 22, notwithstanding the impending IRS levies and the parties’ doubts about the company’s viability, Sullivan Company was still a going concern. Appellants argue, naturally, that it was not. They support this claim with citations to cases in which the companies at issue were either in existence only nominally or had ceased operations.
 
 See Trask v. Susskind,
 
 376 F.2d 17 (5th Cir. 1967);
 
 Mossler Acceptance Company v. Martin,
 
 322 F.2d 183 (5th Cir. 1963),
 
 cert. denied,
 
 376 U.S. 921, 84 S.Ct. 679, 11 L.Ed.2d 616 (1964);
 
 Langham, Langston & Burnett v. Blanchard,
 
 246 F.2d 529 (5th Cir. 1957);
 
 In re Windsor Industries, Inc.,
 
 459 F.Supp. 270 (N.D.Texas 1978). But they offer no authority for the proposition that a company continuing to operate, albeit in serious financial difficulty, is not a going concern.
 

 In a case defining “going concern value” of a business one court commented, “We do not think that the financial outlook of the debtor corporation, or the intention of its stockholders and directors to continue business or to liquidate at an early date, is determinative of the question.”
 
 In re Nathanson,
 
 64 F.2d 912, 913 (6th Cir. 1933). Instead, the court looked to see “[i]f the business is in fact being conducted at the time” and found that it was, despite an adverse financial picture.
 
 Id.
 

 There is no dispute that on April 22 the Sullivan Company customers were being serviced by Sullivan Company guards. Appellants argue that, as a matter of law, as of 5:00 P.M. on that date, with the certainty of IRS levies on accounts receivable the' next morning, the company was in effect out of business because it would be without funds to pay its employees. We disagree. Under the facts here, the question whether the company was a going concern was one of fact to be determined by the jury. Sullivan testified that in the past, when he had come upon hard times, he had been fortunate in obtaining cash on short notice. He stated that he could have made telephone calls on the afternoon of April 22 to his various sources and might have been able to borrow more money. There was also evidence that in the past employees had continued to work despite receiving dishonored or no paychecks. There is nothing in the record to indicate that the guards would not have appeared the next morning at their regular job sites on schedule. The accounts were still being serviced by Sullivan Company and there was no evidence that they could not have been serviced by the company the following day or for an indefinite period thereafter. Thus, having found a transfer to Watts of the operating portion of the Sullivan Company business, the jury was warranted in finding that the transfer was of valuable property.
 

 The Watts appellants further claim that there was insufficient proof as to the amount by which the bankrupt’s estate was diminished as a result of the fraudulent transfer. In their motion for directed verdict they asserted that “plaintiff has introduced no evidence ... that any property asserted to have been so transferred decreased the value of the Sullivan Company’s assets.” They then argued for a judgment n. o. v. on the grounds that “there was insufficient evidence to prove ... that any property asserted to have been so transferred decreased the value of Sullivan Company’s assets, and there was no evidence, or insufficient evidence, to warrant the jury verdict for the plaintiff or the amount of damages.” On appeal, appellants appear to join these grounds as one issue. But because they were distinct below and because the specific question of damages was not raised in their motion for directed verdict, we agree with the district court that the damages issue was waived as a ground for a judgment n. o. v.
 
 See Martinez Moll v.
 
 
 *736
 

 Levitt & Sons of Puerto Rico, Inc.,
 
 583 F.2d 565, 568-69 (1st Cir. 1978).
 
 [7]
 

 Appellants’ claim as to the diminution in value of the bankrupt’s assets is essentially the same as their first argument that no property, i.e. nothing of
 
 value,
 
 passed from Sullivan Company to Watts. We have already determined that the evidence permitted a finding that the company was still a going concern at the time of the transfer. The same evidence which supported a finding that this operation had value also sustains the finding that the bankrupt’s estate suffered a loss to the extent of the transfer.
 

 Finally, the Watts appellants argue that the lower court erred in denying their motion by relying on facts not in evidence and contrary to the parties’ binding admissions. This claim relates to the court’s finding that certain individual items of property had value and its finding that the Sullivan Company customer list was transferred. Because there was sufficient evidence to sustain a finding that the subject of the transfer was the Sullivan Company business itself, we need not address the district court’s treatment of the transfers separately.
 
 [8]
 
 We comment, however, briefly on the claim that the court’s finding relative to the customer list was contrary to an admitted fact.
 

 Admitted Fact # 54 states: “Prior to April 22, 1970, Watts was already aware of the names of Sullivan Company’s customers.” Appellants argue that this stipulation precludes a finding that there was any transfer to Watts of the Sullivan Company’s customer list. The acquisition of this information by Watts, however, occurred as a result of its access to the company’s books during its prior negotiations to purchase the company. Moreover, the evidence supports a finding that due to Otte’s particular expertise and ongoing relationships with these customers, the transfer of the customers to Watts could not have occurred but for his new position with Watts as of April 22. The jury could reasonably have found that without Otte’s personal ability to retain the customers and the necessary guards to provide them uninterrupted service, the customer accounts could not have been taken over by Watts. Watts’ prior knowledge of the customers’ names, then, is beside the point.
 
 [9]
 

 We turn now to the claims of Sullivan and Otte. They make only two new arguments in addition to those of the Watts appellants. They claim that they could not be liable for a fraudulent conveyance (Count I) because they did not actively participate in any transfer and that the evidence does not support the finding that they breached their fiduciary duty to Sullivan Company in permitting its takeover by Watts (Count III). We address the breach of duty argument first which, as a pendent state claim, is to be decided under Massachusetts law.
 

 It is a basic principle of corporation law that Sullivan and Otte, as directors of the Sullivan Company corporation, owed a fiduciary duty to the corporation to protect its interests.
 
 See, e.g., Production Machine Co. v. Howe,
 
 327 Mass. 372, 99 N.E.2d 32 (1951). “If the director does not exercise sufficient care and sound personal judgment in his duties, he will be subject to a personal liability for mismanagement or negligence.” 13A Massachusetts Practice § 465 at 207 (1971) (footnote omitted). Liability may be found even in the absence of bad faith or dishonesty on the part of a director if he fails to recognize his fiduciary duty.
 
 Production Machine Co. v. Howe,
 
 327 Mass. at 378, 99 N.E.2d at 36. Moreover, affirmative malfeasance by a director is not necessary in order to constitute a breach of duty; mere passivity can rise to the level of
 
 *737
 
 negligence if the director does not “exercise the degree of care which a prudent person ordinarily would use as a director.”
 
 Hathaway v. Huntley,
 
 284 Mass. 587, 188 N.E. 616, 618 (1933).
 

 Our review of the record reveals sufficient evidence on which the jury could base a finding of breach of fiduciary duty by both Sullivan and Otte through their participation in the transfer of the corporation’s property without fair consideration while the company was insolvent. Sullivan’s testimony was replete with virtual admissions of his own negligence. When asked at trial to state the cause of Sullivan Company’s serious financial problems prior to April 1970, he stated that it was largely due to his own mismanagement of the business. At no time did he or Otte discuss the effect of a takeover by Watts on the company’s creditors, nor did they consider discussing the matter with the other directors and stockholders. Sullivan also testified that the business was still alive when he and Otte “handed it” to Recklitis, that he probably could have kept the business running for a while if he had pursued his sources of cash at that time. And, finally, after participating in an attempt to sell the business and believing it, at 5:00 P.M. on April 22, to be worth one million dollars, Sullivan “stopped thinking” and walked away from the business. The jury could reasonably have found this to have been an abandonment by Sullivan of his fiduciary duty.
 

 As to Otte, the evidence supports a finding of a more affirmative breach of duty. Although one may be sympathetic to his feeling that as of 5:00 P.M. on April 22 he was unemployed and that his own personal interests lay in accepting Recklitis’ job offer, he was still an officer and director of Sullivan Company to which he continued to owe a fiduciary duty. His agreement to work for Watts and to attempt to bring with him all of the customer accounts and guards of Sullivan Company was the death blow to the corporation of which he was an officer and director. Otte’s abandonment of the sinking Sullivan Company, taking with him its only operating assets, for a safe berth with another corporation was sufficient grounds for a finding that he breached his fiduciary obligations to Sullivan Company.
 

 We now turn to the issue of Sullivan and Otte’s liability under Count I. Although not raised by either of them below or before us, we think that under these facts there can be no liability as a matter of law because neither Sullivan nor Otte received any of the fraudulently transferred property.
 
 [10]
 
 The Act contemplates recovery by the trustee only from recipients of fraudulently transferred property.
 

 Our ruling is informed by the reasoning of the Ninth Circuit in
 
 Elliott v. Glushon,
 
 390 F.2d 514 (9th Cir. 1967), which held that the trustee in bankruptcy could not recover the value of fraudulently transferred property from an attorney who had acted only as an escrow holder and attorney for certain participants in the admitted transactions but had never received any of the property involved. In reaching its conclusion, the' court first examined the pertinent sections of the Bankruptcy Act and noted that they “suggest with some certainty that recovery may be had only against persons who have received the property in question.”
 
 Id.
 
 at 515. Section 67(d) provides that a transaction found to be fraudulent shall be “null and void against the trustee....” 11 U.S.C. § 107(d)(6). Section 70, which vests title in the trustee to,
 
 inter alia,
 
 property fraudulently transferred by the bankrupt, 11 U.S.C. § 110(a)(4), gives the trustee his procedural rights to enforce section 67(d) and provides that if a transfer is made which is fraudulent under any applicable federal or state law, “[t]he trustee shall reclaim and recover such' property or
 
 *738
 

 collect its value from
 
 and avoid such transfer ... against
 
 whoever may hold or have received it
 
 11 U.S.C. § 110(e)(2) (emphasis added).
 

 Noting a conflict among a few earlier cases and distinguishing the leading one,
 
 [11]
 
 the
 
 Elliott
 
 court acknowledged the temptation to borrow from the principle of joint liability among tortfeasors in order to permit recovery against a nonrecipient. It nonetheless held that the purpose of sections 67(d) and 70 of the Act
 

 is clearly to preserve the assets of the bankrupt; they are not intended to render civilly liable all persons who may have contributed in some way to the dissipation of those assets. The Act carefully speaks of conveyances of property as being “null and void,” and authorizes suit by the trustee to “reclaim and recover such property or collect its value.” The actions legislated against are not “prohibited”; those persons whose actions are rendered “null and void” are not made “liable”; and terms such as “damages” are not used. The legislative theory is cancellation, not the creation of liability for the consequences of a wrongful act.
 

 Id.
 
 at 516 (footnote omitted).
 

 Moreover, the court reasoned, the trustee may still have a right of action for fraud or deceit under state law against those who participated in the transaction. Recovery under the Bankruptcy Act, however, embraces only the recipients of the transferred property. We believe this analysis is correct and adopt it, as other courts have done.
 
 See, e.g., Klein v. Tabatchnick,
 
 610 F.2d 1043, 1048 n.4 (2d Cir. 1979);
 
 Jackson v. Star Sprinkler Corp.,
 
 575 F.2d 1223, 1234 (8th Cir. 1978).
 
 See also In re Christian & Porter Aluminum Co.,
 
 584 F.2d 326, 339 (9th Cir. 1978).
 

 The judgments against Sullivan and Otte on Count I must be reversed. This makes it unnecessary to discuss their claim that there was no evidence that they actively participated in any transfer of the assets of Sullivan Company, which, we note, is untenable as to Otte.
 

 Claimed Trial Errors
 

 The Watts appellants claim first and foremost that Sullivan’s opinion as to the value of Sullivan Company was erroneously admitted into evidence. Sullivan was permitted to testify that, in his opinion, the business was worth approximately one million dollars at the time of the transfer to Watts. He relied in part for this opinion on his understanding that service businesses such as his are valued at one dollar for each dollar of annual gross sales. Because Sullivan Company had accounts worth one million dollars as of April 1970, this was the figure he used.
 

 The district court permitted Sullivan to testify to his opinion on the value of the business because, as president and majority stockholder, he was the owner of the property. The court noted that this opinion testimony of an owner is admissible
 

 either as an opinion by a lay witness “based on . . . personal perception” and “helpful to a clear understanding of his testimony or the determination of a fact in issue” under [Federal] Rule [of Evidence] 701, or as an expert opinion by one who is “qualified as an expert by knowledge . . . [or] experience” under Rule 702.
 

 The accompanying Advisory Committee Notes on Rule 702 make clear that the rule encompasses more than merely an expert in a technical sense. Rather, “within the scope of the rule are not only experts in the strictest sense of the word, e.g. physicians, physicists, and architects, but also the large group sometimes called ‘skilled’ witnesses, such as bankers or landowners testifying to land values.” Fed.Rules Evid. Rule 702, 28 U.S.C.A. at 462 (1975).
 

 
 *739
 
 An owner of a business is competent to give his opinion as to the value of his property.
 
 Kestenbaum v. Falstaff Brewing Corp.,
 
 514 F.2d 690, 698 (5th Cir. 1975),
 
 cert. denied,
 
 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976).
 
 See United States v. Sowards,
 
 370 F.2d 87, 92 (10th Cir. 1966). Whether or not his opinion is accurate goes to the weight of the testimony, not its admissibility.
 
 Meredith v. Hardy,
 
 554 F.2d 764, 765 (5th Cir. 1977).
 
 Cf. Ford Motor Co. v. Webster’s Auto Sales, Inc.,
 
 361 F.2d 874, 886 (1st Cir. 1966) (plaintiff’s method of valuation of damages attacked by defendant; accuracy of plaintiff’s testimony goes to weight not admissibility). An owner’s opinion as to value has been excluded where the opinion rested on hypothesized facts or speculation on circumstances not in existence.
 
 See Klapmeier v. Telecheck International, Inc.,
 
 482 F.2d 247, 253 (8th Cir. 1973);
 
 Pacific Mailing Equipment Corp. v. Pitney Bowes, Inc.,
 
 499 F.Supp. 108, 119 (N.D.Cal.1980).
 

 Appellants claim that Sullivan’s opinion was not based on his personal knowledge as the owner of the company but solely on the opinions of others. This claim derives from Sullivan’s testimony that he became aware of the gross sales valuation formula through talking with other knowledgeable businessmen several years before and again after Recklitis’ offer. He stated that he also talked to “other financial people” in Boston who confirmed that the gross sales method was an accurate measure of the value of a service company. We note that this is a common and reliable way-of obtaining knowledge. Most knowledge has its roots in hearsay.
 

 Appellants are mistaken, moreover, in their assertion that his opinion came solely from the opinions of others. Sullivan’s testimony was that he relied on this valuation formula in part, and there was evidence from which the district court properly could have found Sullivan’s substantial personal familiarity with the property such that his opinion would be admissible. He had been president and majority or near-majority stockholder in the business since its beginnings in the late 1950’s and had been in charge of the finances of the company, securing loans from banks and other sources. He watched his company expand to a million dollars worth of business in the year prior to the takeover due to loyal customers who had sizeable accounts and paid their bills regularly. These facts, combined with other evidence indicating Sullivan’s intimate familiarity with his business, support the district court’s determination that his opinion as to value was admissible. The testimony was subject to severe attack on cross-examination. “[W]ith the jury as fact finder shouldering the responsibility of judging the credibility of the witness .. . and assessing the weight of opinion testimony,”
 
 Kestenbaum v. Falstaff Brewing Corp.,
 
 514 F.2d at 699, we uphold the lower court’s determination of the admissibility of this evidence as within its sound discretion.
 
 See Mercado v. Wollard Aircraft Equipment, Inc.,
 
 574 F.2d 654, 655 (1st Cir. 1978);
 
 Redding v. Picard Motor Sales, Inc.,
 
 403 F.2d 788, 792 (1st Cir. 1968).
 

 Appellants also argue strenuously that the district court erred in allowing the trustee to introduce evidence of Recklitis’ 1979 federal conviction for fraud. They claim that Federal Rule of Evidence 609, permitting inquiry about a conviction during cross-examination, is designed to limit the use of such evidence to instances where a witness voluntarily places his credibility in issue by testifying on direct examination. Here, Recklitis was called as a witness by the trustee, who elicited the information during direct examination. The trustee, on the other hand, asserts that because Recklitis was an opposing party, when he was called to testify he was being cross-examined in the first instance, and, therefore, Rule 609 permitted the inquiry. We conclude that the evidence was admissible.
 

 Recklitis, as a named defendant and president of Watts, was an adverse party called as a witness by the plaintiff in his case-in-chief. Federal Rule of Civil Procedure 43(b) governs the mode of inquiry of this type of witness and provides in pertinent part:
 

 
 *740
 
 A party may call an
 
 adverse party
 
 or an officer, director, or managing agent of a public .or private corporation or of a partnership or association which is an adverse party, and interrogate him by leading questions and contradict
 
 and impeach him in all respects
 
 as if he had been called by the adverse party ....
 

 (emphasis added). Federal Rule of Evidence 607 provides: “The credibility of a witness may be attacked by any party, including the party calling him.” Read together, these two rules allow, in a civil case, the impeachment of an adverse party by the party calling him through evidence of a prior criminal conviction. Impeachment under Rule 607 is not limited to occasions where the party calling the witness is surprised or misled by the testimony.
 
 Scholz Homes, Inc. v. Wallace,
 
 590 F.2d 860, 863 (10th Cir. 1979). “Moreover, Rule 607, by its terms, places no limitation on the manner in which a party may impeach his own witness, and there is no reason to believe that such a witness cannot be impeached by evidence of a prior conviction.”
 
 United States v. Dixon,
 
 547 F.2d 1079, 1082 n.2 (9th Cir. 1976). There was no error in admitting this evidence.
 

 We have carefully considered appellants’ other claims
 
 [12]
 
 of trial error and find them to be without merit.
 

 Motions for New Trial
 

 We turn now to appellants’ claims that their motions for new trial based on insufficiency of the evidence were improperly denied by the district court. A motion for new trial on this ground is subject to a standard of review as strict as that for a judgment n. o. v. and we will reverse only if we find an abuse of the trial court’s discretion.
 
 Hubbard
 
 v.
 
 Faros Fisheries, Inc.,
 
 626 F.2d at 200;
 
 Rios v. Empresas Lineas Maritimas Argentinas,
 
 575 F.2d at 990. We have expressed the test for granting a new trial as follows:
 

 A trial court, in assessing whether to grant a new trial for lack of legally sufficient evidence, does not properly do so merely because it might have come to a result different from that reached by the jury. The district court should order a new trial only when convinced that a miscarriage of justice would otherwise obtain. Where credibility of witnesses is at issue, special care should be taken not to invade the province peculiarly pertaining to the jury.
 

 Rios v. Empresas Lineas Maritimas Argentinas,
 
 575 F.2d at 990 (citations omitted). Applying this standard, we conclude that there was sufficient evidence from which the jury could find a transfer of property to Watts which diminished the assets of the bankrupt.
 

 Turning to appellants’ claim that the trustee failed to prove damages, we find that there was sufficient evidence to allow the jury to award damages of $750,-000. Sullivan and Otte both testified that they believed the company to be worth one million dollars, Sullivan asserting this to be the value at the time of the transfer.
 
 [13]
 
 There was evidence that in the year following the takeover $680,000 of Watts’ gross sales was attributable to customer accounts it had taken from Sullivan Company.
 

 Appellants argue that the only evidence before the jury on the damages issue was in the nature of “guesswork” and “speculation.” They use as authority antitrust cases in which plaintiffs’ damage claims were based on speculating about events that did not and/or might not occur.
 
 See, e.g., Keener v. Sizzler Family Steak Houses,
 
 597 F.2d 453, 457 (5th Cir. 1979);
 
 Klapmeier v. Telecheck International, Inc.,
 
 482 F.2d at 253. Suffice to say that the fact situations in these cases are inapposite to this. The evidence of damages here — of the loss to Sullivan Company of its operating assets—
 
 *741
 
 was not a matter of conjecture. The jury was warranted in finding that the business was still valuable on April 22 and that its transfer without fair consideration while the company was insolvent was fraudulent. It was free to accept or reject or give whatever weight it deemed appropriate to the evidence of value at the time of the transfer. Sullivan did not hypothesize in his testimony; he did not say that the business would have been worth a million dollars
 
 if
 
 the IRS levies were not imminent. Indeed, on cross-examination by defense counsel he stated that, even in light of the levies, the business was still worth that amount because of the type of customers, the continuity established and maintained, and the fact that the customers regularly paid their bills on time. Sullivan’s opinion together with the figure of Watts’ subsequent gross sales from the company’s former customers were sufficient to send the issue of damages to the jury.
 

 Cross-Appeal
 

 We now come to the cross-appeal of the trustee. Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, the trustee filed in the district court a motion to alter or amend judgment. The motion was granted with respect to the technical request to change the name of the plaintiff to the successor trustee but was denied in two other respects. The trustee claims the court erred in denying his request for the addition of prejudgment interest to the verdict on Count I and for the addition of Watts, Consolidated and Recklitis to those found liable on Count III.
 

 Because Count I of the complaint stated a cause of action arising under the Bankruptcy Act, whether or not the trustee is entitled to prejudgment interest as an element of damages is a matter of federal law.
 
 See Rodgers
 
 v.
 
 United States,
 
 332 U.S. 371, 373, 68 S.Ct. 5, 6, 92 L.Ed. 3 (1947);
 
 Royal Indemnity Co.
 
 v.
 
 United States,
 
 313 U.S. 289, 296, 61 S.Ct. 995, 997, 85 L.Ed. 1361 (1941);
 
 Furtado v. Bishop,
 
 604 F.2d 80, 97 (1st Cir. 1979),
 
 cert. denied,
 
 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980);
 
 Moore-McCormack Lines v. Amirault,
 
 202 F.2d 893, 897 (1st Cir. 1953). In the absence of a general federal statute or a provision in the Bankruptcy Act on prejudgment interest, we turn to federal common law for guidance.
 

 From the leading case of
 
 Roth v. Fabrikant Bros.,
 
 175 F.2d 665 (2d Cir. 1949), comes the general rule that a prevailing plaintiff is entitled to prejudgment interest as an element of damages when the amount of his claim is either “liquidated” or “reasonably ascertainable by reference to established market values.”
 
 Id.
 
 at 669. It has been said that the court’s prejudgment interest inquiry is reduceable to “whether the demand is of such a nature that its exact pecuniary amount was either
 
 ascertained,
 
 or ascertainable by simple computation, or by reference to generally recognized standards such as market price[.]”
 
 [14]
 
 1 Sedg-wick, Damages § 300 at 571 (9th ed. 1912) (emphasis original). Thus in
 
 Roth,
 
 a case involving a voidable preference and a fraudulent transfer under the Bankruptcy Act, because the preference claim involved recovery of a definite sum, interest thereon was allowed. The court held that recovery on the transfer claim on the other hand did not entitle the plaintiff to interest because the amounts of those claims were not reasonably certain, noting that “there could hardly be a situation where the value of the property transferred was more uncertain than that of the highly speculative items of jewelry involved in the plaintiff’s claims.” 175 F.2d at 669. Apparently contributing to the court’s conclusion that the value was uncertain and therefore not meriting interest was its finding that “[t]he testimony differed as to the considerations which might fix the value of the different items.”
 
 Id.
 
 at 668.
 

 
 *742
 
 In
 
 Jones v. United States,
 
 258 U.S. 40, 42 S.Ct. 218, 66 L.Ed. 453 (1922), the Supreme Court upheld an award of prejudgment interest on a claim that timber land was converted, where the value of the land was made ascertainable by the testimony of timber experts as to the current market value of similar land. Interest was properly awarded, the Court held, because the owner was deprived of “property having a definite or ascertainable value.”
 
 Id.
 
 at 49, 42 S.Ct. at 220.
 

 Applying this analysis, the district court found that the damages to Sullivan Company were not ascertainable with sufficient certainty to require the addition of prejudgment interest. With this conclusion we agree.
 

 The trustee claimed, in bringing the action, the right to recover from the defendants the value of what was transferred, i.e. the operating portion of Sullivan Company. The amount in dispute was not liquidated, there was no transfer of a definite sum of cash, and the parties did not and do not agree on the value of what was transferred.
 
 See Palmer v. Radio Corp. of America,
 
 453 F.2d 1133, 1140 (5th Cir. 1972). The evidence as to the value of the transferred property ranged from one million dollars to the $680,000 figure representing Watts’ gross receipts from thirteen out of the seventeen former Sullivan Company customers for the year following the takeover.
 
 [15]
 
 There was no evidence proffered by either party as to any current market value for guard service businesses or for service businesses generally, leaving the jury without the guidance of an established, recognized standard of prices.
 
 See Jones v. United States,
 
 258 U.S. at 49, 42 S.Ct. at 220;
 
 Roth v. Fabrikant Bros.,
 
 175 F.2d at 669, 1 Sedgwick, Damages § 300 at 571. We conclude, as did the district court, that the damages were not ascertainable before trial with reasonable certainty and that, therefore, the trustee was not entitled to prejudgment interest except in the discretion of the jury.
 
 See Furtado v. Bishop,
 
 604 F.2d at 98. By not requesting a jury instruction or objecting to the court’s charge on damages, the trustee has waived any claim to prejudgment interest.
 

 The trustee’s final argument involves his motion to amend or alter judgment to include the Watts appellants in the verdict on Count III. His contention is that the verdict in their favor is inconsistent with the verdict against them on Count I and with the verdict against the others on Count III.
 

 A motion to alter or amend judgment pursuant to Rule 59(e) may not be granted where to do so would undermine the jury’s fact-finding role and trample on the defendant’s seventh amendment right to a jury trial.
 
 See Branson
 
 v.
 
 Prins Insurance, Inc.,
 
 79 F.R.D. 662, 664 (D.S.D.1978); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2817 at 111 (1973). If the relief sought here were granted, it would require a reexamination of the facts found by the jury and a finding of liability where the jury had expressly found none.
 
 [16]
 

 
 *743
 
 Moreover, a Rule 59(e) motion is addressed to the discretion of the district court.
 
 Slater v. RFC Corp.,
 
 621 F.2d 932, 939 (8th Cir. 1980);
 
 York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp.,
 
 447 F.2d 786, 794 (5th Cir. 1971);
 
 Florencio Roman v. Puerto Rico Maritime Shipping,
 
 454 F.Supp. 521, 526 (D.P.R.1978).
 

 We hold that there was no abuse of discretion in the denial by the district court of the trustee’s motion to amend the judgment as to Count III.
 

 We affirm the finding of liability on Count I as to Watts Detective Agency, Inc., Consolidated Services Corporation and Christopher P. Recklitis. We reverse the finding of liability on Count I as to Daniel C. Sullivan and Billy R. Otte. We affirm the finding of liability on Count III as to Daniel C. Sullivan and Billy R. Otte. The verdict of the jury on damages is affirmed.
 

 Judgments accordingly.
 

 [1]
 

 . Former 11 U.S.C. § 107(d)(2)(a) provides:
 

 Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this title by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent[.]
 

 At the time this action was commenced, the former Act was still in effect.
 

 [2]
 

 . The Sullivan Company payroll was substantial; the company employed approximately 225 full and part-time guards.
 

 [3]
 

 . Consolidated, parent company to several service businesses, had in the interim purchased Watts, another security guard business.
 

 [4]
 

 . This appears to be the only issue as to whether a fraudulent transfer occurred. The defendants did not claim that fair consideration was paid to Sullivan Company, nor is there any dispute that the transaction occurred during the statutory period when the company was or was thereby rendered insolvent.
 

 [5]
 

 . Appellants have not challenged the implicit finding of the jury that, as the Bankruptcy Act requires, the transfer here was made by the “debtor." Both Sullivan (the company’s president) and Otte (the vice-president) were directors of D. C. Sullivan & Co. and both took part in the meeting on April 22. Otte was quite active in helping Recklitis obtain the “property” transferred, and Sullivan did nothing to stop the transfer. Of course, had these men been mere supervisory employees not empowered to act on behalf of the company, a different situation would have been presented.
 

 [6]
 

 . Recklitis was further ablé to insure continuity on the part of employees by authorizing Otte to tell them that their past unpaid wages would be paid by Watts if they came along.
 

 [7]
 

 . We do, however, consider it
 
 infra
 
 as a ground stated in appellants’ motion for new trial.
 

 [8]
 

 . We have reviewed the specific claimed errors, however, and are satisfied that nothing in the district court’s analysis is inconsistent with a fair reading of the record in the light most favorable to the trustee.
 

 [9]
 

 .Recklitis testified that, even knowing who the company’s customers were, it would not have been “proper” for Watts to have attempted to lure them away.
 

 [10]
 

 . Because this issue was not raised below, we would ordinarily not consider it for the first time on appeal.
 
 Johnston v. Holiday Inns, Inc.,
 
 595 F.2d 890, 894 (1st Cir. 1979). We recognized, however, in
 
 Dobb v. Baker,
 
 505 F.2d 1041 (1st Cir. 1974), that we might deviate from this rule where the new ground for reversal is “so compelling as virtually to insure appellant’s success.”
 
 Id.
 
 at 1044. Here, the issue turns on an open and shut question of law.
 

 [11]
 

 .
 
 Brainard
 
 v.
 
 Cohn,
 
 8 F.2d 13 (9th Cir. 1925), a case decided over four decades before by the same circuit, permitted recovery against a non-recipient of fraudulently transferred property. In that case, however, a conspiracy had been alleged, and the court held full recovery to be proper against a conspirator who received some but not all of the transferred merchandise. Central to that decision was the fact that the conspirators had intermixed the bankrupt’s property with their own.
 
 Id.
 
 at 15.
 

 [12]
 

 . They challenge a portion of the court’s charge to the jury and its failure to give a requested instruction. We find no error. Their claim that the verdict resulted from confusion, passion and prejudice on the part of the jury is rejected.
 

 [13]
 

 . We observe that as parties-defendants, Otte’s and Sullivan’s testimony as to the value of the business before its takeover was against ■ their own interests, not only on the issue of damages but also as to their breach of duty to the corporation.
 

 [14]
 

 . A simple example of a claim that is ascertainable is the claim for payment for goods sold at a unit price. The contract does not call for a specified, liquidated amount, but simple calculation accomplished by multiplying the number of units sold times the price, will yield a precise measurement.
 

 D. Dobbs, Law of Remedies § 3.5 at 167 (1973).
 

 [15]
 

 . It would appear that a combination of these figures may have formed the basis of the jury’s verdict of $750,000. Watts retained approximately 75% of Sullivan Company’s former customers. This percentage may have been applied to the total gross receipts of $1,000,000 from all the seventeen Sullivan Company customers.
 

 [16]
 

 . We have found only one federal case in which a district court granted a Rule 59(e) motion which is in any way similar to our case. In
 
 Mumma
 
 v.
 
 Reading Co.,
 
 247 F.Supp. 252 (E.D.Pa.1965), a jury found the defendant liable for negligence and, finding the plaintiff contrib-utorily negligent in the amount of 45%, reduced the verdict to that extent. Granting the motion to amend the judgment to restore the verdict to the full amount of damages found by the jury, the court declared that there was simply no evidence at all of contributory negligence by the plaintiff. The court briefly alluded to the question of whether granting the motion would call upon it to change the factual findings of the jury and concluded that it was merely striking from the judgment the erroneous portion “because it lacked both legal and factual justification.”
 
 Id.
 
 at 260. Although we do not think
 
 Mumma
 
 has much precedential value, it is distinguishable from the case before us. The jury there found the defendant liable. The amendment allowed by the court only changed this as to the percentage of liability.